FILED
United States Court of Appeals
Tenth Circuit

June 21, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

No. 09-3073

SHAUN J. SALAZAR,

    Defendant-Appellee.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS
(D.C. No. 2:08-CR-20084-KHV-1)**

---

Richard A. Friedman, Appellate Section, Criminal Division, United States Department of Justice (Lanny D. Welch, United States Attorney, James A. Brown and Terra D. Morehead, Assistant United States Attorneys, District of Kansas, with him on the briefs), Washington, D.C., for Plaintiff-Appellant.

Ronald E. Wurtz, Assistant Federal Public Defender (Cyd Gilman, Federal Public Defender, with him on the brief), Topeka, Kansas, for the Defendant-Appellee.

---

Before **HENRY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

---

**HENRY**, Circuit Judge.

After the government indicted him for being a felon in possession of a firearm and ammunition, Shaun J. Salazar filed a motion to suppress the evidence that a Kansas Highway Patrol Trooper discovered in Mr. Salazar's pickup truck during a January 19, 2008 detention. Mr. Salazar argued that, when the trooper activated his emergency lights, he submitted to the officer's show of authority by slowly backing up his pickup truck for about twenty seconds and then driving forward to the driver's side of the patrol car. At that point, Mr. Salazar maintained, the trooper lacked reasonable suspicion of criminal activity and the resulting detention therefore violated the Fourth Amendment. The district court agreed and concluded that the evidence that the trooper discovered in Mr. Salazar's pickup truck should be suppressed.

In this interlocutory appeal, the government argues that Mr. Salazar did not submit to the trooper's initial show of authority. Instead, the government maintains, Mr. Salazar's slowly backing up his pickup truck constituted an evasive action: it was not until the trooper stepped out of the patrol car, drew his firearm—which he kept at his side—and told Mr. Salazar to get out of the pickup, that Mr. Salazar submitted to the trooper's authority by complying with that order. At that point, the government argues, the trooper had reasonable suspicion to detain him.

Although the issue is close, we agree with the government and therefore reverse the district court's decision and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

We view the record in the light most favorable to the prevailing party–here Mr. Salazar. *See United States v. Hauk*, 412 F.3d 1179, 1185 (10th Cir. 2005).

### A. The investigative detention on January 19, 2008

On January 19, 2008, at approximately 10:00 p.m., Kansas Highway Patrol Trooper Terry L. Berner stopped to get gas at a Kansas Department of Transportation facility on U.S. Highway 24-40 in Douglas County, Kansas. While in the parking lot, Trooper Berner observed a Ford pickup enter the parking lot directly across the highway at a location known as Tee Pee Junction.

Tee Pee Junction contains a building that resembles a tee pee, a nearby building used for banquets and parties, and a parking lot. An area at the rear of parking lot was used by a local business, Wright's Tree Service, to store its trucks at night. The buildings were not in use on the evening at issue.

Trooper Berner observed the pickup, which was driven by Mr. Salazar, make a U-turn, back up the entire length of the parking lot, and shut its lights off. The pickup truck parked next to a vehicle belonging to Wright's Tree Service.

After the pickup stopped, Trooper Berner saw a reflection of what appeared to be a door opening. However, the trooper did not see anyone exit the pickup. At the hearing on the motion to suppress, Trooper Berner explained that his observations were consistent with at least three scenarios: (1) that the person in the vehicle needed to urinate; (2) that he or she wanted to get something outside of the vehicle; or (3) that the person was seeking to burglarize the vehicles in the parking lot.

Trooper Berner then proceeded to drive his patrol car across the highway toward the parking lot with his headlights off. As Trooper Berner approached, the pickup turned on its headlights and began moving forward toward the patrol car. At that point, the two vehicles were approximately 75-100 feet away from each other.

Upon seeing the pickup truck beginning to move forward, Trooper Berner activated his emergency lights, including his "wigwag flashing headlights and dash-mounted red and blue lights . . . inside the windshield." Aplt's App. at 23 (Tr. of Hr'g on Mot. to Suppress). The emergency lights activated the camera in the patrol car, and the resulting recording is part of our record.

The recording indicates that Trooper Berner's patrol car and Mr. Salazar's pickup drove slowly toward each other for fourteen seconds. Both vehicles simultaneously came to a halt a few feet apart. Trooper Berner then directed his

-4-

spotlight on Mr. Salazar. Within less than a second, Mr. Salazar began backing his pickup truck away from the patrol car and continued backing away for twenty seconds. Trooper Berner slowly drove toward the pickup, so the distance between the vehicles remained approximately twenty feet or less. After twenty seconds, the pickup momentarily stopped and then drove forward around the driver's side of the patrol car.

When Mr. Salazar's pickup started to go around Trooper Berner's patrol car, Trooper Berner stepped out of his car, drew his firearm, and yelled at Mr. Salazar to stop and get out of the pickup. At that point, Mr. Salazar complied.

Trooper Berner then holstered his weapon. At Trooper Berner's direction, Mr. Salazar moved to the front of the patrol car. Trooper Berner asked for identification. Mr. Salazar gave his name, but he could not produce a driver's license. He admitted that he had been drinking.

Trooper Berner handcuffed Mr. Salazar and placed him under arrest for driving without a license. Then, Trooper Berner called for assistance and learned from the dispatcher that Mr. Salazar did not have a valid driver's license.

At about 10:15 p.m., another officer arrived at the scene. Trooper Berner proceeded to inspect the location where Mr. Salazar had briefly stopped his

pickup after backing up. Trooper Berner found a loaded .38 caliber revolver with an obliterated serial number. Inside the pickup, Trooper Berner found a gun case and a box of ammunition compatible with the revolver.

### B. The district court proceedings

In July 2008, a federal grand jury returned an indictment against Mr. Salazar for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). In response, Mr. Salazar filed a motion to suppress the physical evidence seized during the detention, as well as the statements that he made at that time. He argued that Trooper Berner lacked reasonable suspicion to detain him.

The district court held an evidentiary hearing. Mr. Salazar testified briefly, identifying the owner of the pickup that he was driving on January 19, 2008, and explaining that he had permission to borrow it. Trooper Berner gave a detailed account of the detention. After hearing the testimony, the district court partially granted Mr. Salazar's motion to suppress.

In particular, the court ruled that Trooper Berner's activation of his emergency lights was a "show of authority" ordering Mr. Salazar to stop. Aplt's App. at 73. However, the court further reasoned that Mr. Salazar was not "seized" for Fourth Amendment purposes until he submitted to that show of authority. *Id.* (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

According to the district court, this submission to authority occurred when Trooper Berner activated his emergency lights and "blocked [Mr. Salazar's] pickup from leaving the lot." *Id.* at 74. As evidence of this submission, the court noted that Mr. Salazar "slowly backed up, then pulled alongside the patrol car, applied the brakes and leaned out of the pickup window to talk to Trooper Berner." *Id.*

After finding that Mr. Salazar was already seized by the time he began backing up his pickup, the court ruled that the seizure was not supported by reasonable suspicion. The court considered the following factors: "Trooper Berner knew that (1) at 10:00 p.m., [Mr. Salazar] pulled his truck into a parking lot next to a business which was closed; (2) the parking lot had no other activity; (3) [Mr. Salazar] backed up in the parking lot next to a commercial tree service vehicle which was stored on the lot; (4) [Mr. Salazar] turned off the truck headlights; and (5) as Trooper Berner approached in his patrol car, [Mr. Salazar] turned on the truck headlights and started to leave the parking lot." *Id.* at 75. The court thus suppressed the physical evidence found in the pickup as well as Mr. Salazar's statements to the trooper.

In contrast, as to the .38 caliber revolver that Trooper Berner discovered on the ground, the court denied Mr. Salazar's motion. In the court's view, Mr. Salazar had abandoned the weapon, and Trooper Berner had properly checked the parking lot and retrieved it.

-7-

## II. DISCUSSION

On appeal, the government argues that Mr. Salazar was not seized until he submitted to Trooper Berner's show of authority—the patrol car's flashing lights—and that this submission did not occur until Mr. Salazar got out of the pickup at the trooper's command. At this point, the government maintains, there was reasonable suspicion sufficient to justify the detention. In addition to other suspicious circumstances, the government points to Mr. Salazar's evasive conduct in backing away from the patrol car when Trooper Berner first activated his lights.

In response, Mr. Salazar contends that the district court properly concluded that he submitted to Trooper Berner's show of authority when he backed up his pickup and "approached the driver's side of the patrol car with his own window down to engage the officer." Aple's Br. at 13. At that point, Mr. Salazar maintains, Trooper Berner lacked reasonable suspicion to detain him.

### A. Standard of review

We review the district court's findings of fact on a motion to suppress for clear error, examining the evidence in the light most favorable to the prevailing party. *See Hauk*, 412 F.3d at 1185. The ultimate determination of reasonable suspicion is a mixed question of law and fact that we review de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Santos*, 403 F.3d 1120, 1124 (10th Cir. 2005).

Here, the parties disagree as to the applicable standard of review. The government maintains that "[w]hen a seizure occurred—*i.e.*, when [Mr.] Salazar submitted to the trooper's command to stop and submit to an investigative detention—is a question of law." Aplt's Reply Br. at 6 (citing *United States v. Guerrero*, 472 F.3d 784, 786 (10th Cir. 2007)); *see also Guerrero*, 472 F.3d at 786 (stating that "the unlawful detention inquiry is fact-intensive, and we review the district court's fact findings for clear error" but that "the ultimate issue of whether a seizure occurred is a question of law, which we review *de novo*") (internal quotation marks and citation omitted). In response, Mr. Salazar contends that the question of when the seizure occurred is a factual question that we review only for clear error. *See* Aple's Br. at 8 (asserting that "the Government must show clear error in the Court's findings that the defendant was seized from the activation of the emergency lights").

In our view, the key question here—when the seizure occurred—is a legal one that we must examine de novo. There is no dispute about the relevant underlying facts (*i.e.*, that Mr. Salazar backed his truck away from a patrol car that had its lights flashing, then stopped his truck, and then drove his truck forward to the driver's side of the police car). We must now determine, given these undisputed facts, when the seizure occurred. That inquiry involves legal principles that we apply here.

In particular, "the test for existence of a 'show of authority' is an objective

one:  not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  *Hodari D.*, 499 U.S. at 628 (*quoting United States v. Mendenhall*, 446 U.S. 544, 553 (1980)).  The question of whether the suspect submitted to that authority is also an objective one.  *See United States v. Cardoza*, 129 F.3d 6, 14 n.4 (1st Cir. 1997) (stating that "given the generally objective standards employed in Fourth Amendment seizure analysis, we would see little reason to inquire into the subjective intent of the detainee in making the determination whether or not he or she has 'submitted to' a show of authority") (citing *Hodari D.*, 499 U.S. at 626).

**B.  Under *Hodari D.*, a suspect who is not physically restrained is seized under the Fourth Amendment when an officer shows his authority and the suspect submits to that authority.**

The Fourth Amendment prohibits unreasonable seizures by law enforcement officers.  U.S. Const. amend. IV.  Nevertheless, "not all personal intercourse between policemen and citizens involves 'seizures' of persons."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  "Only when the officer, by means of physical force *or* show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  *Id.* (emphasis added).

When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the

citizen "submit[s] to the assertion of authority." *See Hodari D.*, 499 U.S. at 625-26 (1991). Accordingly, in *Hodari D.*, the Supreme Court held that a suspect "was not seized until he was tackled [by a pursuing officer]." *Id.* at 629.

In this case, the primary dispute concerns the submission-to-authority requirement. In determining whether particular conduct constitutes submission to authority, we must examine "'the totality of the circumstances–the whole picture.'" *United States v. Baldwin*, 496 F.3d 215, 219 (2d Cir. 2007) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Accordingly, the Supreme Court has explained that "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin v. California*, 551 U.S. 249, 262 (2007); *see generally* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.4(d), at 462 (4th ed. 2004) (observing that "lower courts [applying *Hodari D.*] will frequently be confronted with difficult questions concerning precisely when the requisite physical seizure or submission to authority occurs"). "[I]t is the nature of the interaction, and not its length, that matters." *Baldwin*, 496 F.3d at 219.

Because the standard is an objective one, we consider whether a citizen has submitted to authority by examining the view of a reasonable law enforcement officer under the circumstances. *See Cardoza*, 129 F.3d at 14 n.4. In other Fourth

Amendment applications of the reasonable officer standard, we have characterized that reasonable officer as "prudent, cautious and trained." *United States v. Santana-Garcia,* 264 F.3d 1188, 1192 (10th Cir. 2001) (determining whether an officer had probable cause to arrest a suspect); *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998) (considering the exigent circumstances exception to the warrant requirement). Here, in determining when Mr. Salazar submitted to Trooper Berner's authority, we will employ the same "prudent, cautious and trained" officer standard.

This circuit has applied *Hodari D.*'s submission-to-authority standard in a variety of circumstances. For example, in *United States v. Harris*, 313 F.3d 1228, 1231-32 (10th Cir. 2002), a police officer approached the defendant and asked him for identification. The defendant Mr. Harris ignored the officer and continued walking. The police officer repeated the request for identification. Mr. Harris again refused to comply and walked past the police officer. Mr. Harris then placed his hands in his pockets and began walking backwards, facing the police officer. The officer suspected that Mr. Harris might be concealing a weapon. After Mr. Harris refused the officer's request to remove his hands from his pockets, the officer grabbed Mr. Harris's hands, removed them from the pockets, and took him to the police car.

We rejected Mr. Harris's argument that he was seized when the officer first asked him for identification. We reasoned that, "even if [the officer's] requests for identification could be construed as an assertion of authority, [Mr. Harris] did not submit to it. Accordingly, [Mr. Harris] was not seized for purposes of the Fourth Amendment until [the officer] implemented physical force by removing [Mr. Harris's] hands from his pockets and escorting him to the police car." *Id.* at 1235 (internal quotation marks omitted); *see also Latta v. Keryte*, 118 F.3d 693, 700 (10th Cir. 1997) (holding that an unsuccessful pursuit of the defendant on an interstate highway was not a seizure and explaining that "[w]hile the pursuit constituted an assertion of authority, the pursuit did not cause Mr. Latta to submit to the authority or succeed in stopping him").

Applying *Hodari D.*, other courts have held that a suspect's temporary hesitation, followed by flight, does not constitute a submission to authority. For example, in *United States v. Holloway*, 962 F.2d 451, 455-58 (5th Cir. 1992), a police car blocked the path of the suspect's car, thereby forcing it to stop. However, the suspect put his car in reverse and rammed another police car that was approaching from the rear. The Fifth Circuit ruled that the suspect did not submit to the officer's authority when his initial path was blocked and that, as a result, a seizure had not occurred at that time.

Similarly, in *Baldwin*, a suspect stopped his car in response to police pursuit in a marked car with its emergency lights and siren activated. However, when the officers got out of their car and approached the suspect's car on foot, the suspect drove away. The Second Circuit held that "to comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority, for 'there is no seizure without actual submission.'" 496 F.3d at 218 (quoting *Brendlin*, 551 U.S. at 254); *see also United States v. Waterman*, 569 F.3d 144, 146 n.3 (3d Cir. 2009) (stating that submission to authority under *Hodari D.* "requires at minimum, that a suspect manifest compliance with police orders").

**C. Mr. Salazar was not seized until he submitted to Trooper Berner's show of authority by obeying the command to get out of his truck.**

Applying *Hodari D.*, the parties agree that Trooper Berner's activation of his flashing lights constituted a show of authority. *See* Aplt's Br. at 17 (stating that "[t]he activation of a patrol car's emergency lights is a well accepted 'show of authority' commanding the driver to stop his vehicle and submit to an investigative detention"); Aple's Br. at 13 (stating that "[a]n officer's activation of a vehicle's emergency lights appears coercive to a reasonable person") (internal quotation marks and citation omitted); *see also Brower v. County of Inyo,* 489 U.S. 593, 598 (1989) (stating that "a police car pursuing with flashing lights" is "a significant show of authority"). The government and Mr. Salazar disagree as to

the moment when Mr. Salazar should have recognized the assertion of authority and the moment when he submitted to that authority.

In particular, as to the moment of recognition, the government maintains that, as the patrol car first approached Mr. Salazar's pickup truck with its emergency lights activated, "[n]o reasonable person in Mr. Salazar's position could have misunderstood that the show of authority was directed at him." Aplt's Br. at 18. Mr. Salazar responds by invoking the district court's finding that he did not recognize Trooper Berner's show of authority until a few seconds later, *i.e.* "some time after [the patrol car] stopped in front of the pickup." Aplt's Br. at 18-19 (quoting Aplt's App. at 71 n.2).

As to the second part of the *Hodari D.* inquiry, the government maintains that Mr. Salazar did not submit to Trooper Berner's show of authority until he complied with the command to get out of his truck. In response, Mr. Salazar defends the district court's ruling that his submission began when he started to back up his truck so that he could pull around to the driver's side of Trooper Berner's patrol car. In Mr. Salazar's view, he "did not flee, but merely repositioned his truck in response to the oncoming vehicle, then approached the driver's side of the patrol car with his own window down to engage the officer." Aple's Br. at 13.

Fortunately, we need not decide precisely when Mr. Salazar actually recognized Trooper Berner's flashing lights as a show of authority. The standard is an objective one: we ask when "the officer's words and actions would have conveyed . . . to a reasonable person [that he was being ordered to restrict his movement]." *Hodari D.*, 499 U.S. at 628. Assuming without deciding that a reasonable person would not have recognized "that Trooper Berner's vehicle was a patrol car until some time after it stopped in front of [Mr. Salazar's] pickup," (as Mr. Salazar argues and the district court suggests), *see* Aplt's App. at 71 n.1, we are persuaded that Mr. Salazar did not submit to that authority until he complied with Trooper Berner's command to get out of the pickup.

In support of that conclusion, we note that Mr. Salazar cites no authority, nor have we found any, that suggests that, in these or similar circumstances, backing away from a police car with flashing lights can be plausibly viewed as submission to the command to stop. Additionally, although it is not dispositive on this legal issue, Trooper Berner's testimony supports the government's position.

Trooper Berner explained that, as Mr. Salazar's truck began to back away, he was concerned that "this vehicle [was] trying to allude [sic] me," Aplt's App. at 24, and that, at that point, "I'm not quite sure what he's doing or why he's doing what he's doing." *Id.* at 31. We find that assessment entirely reasonable. From the point of view of a "prudent, cautious, and trained officer[]," *see Anderson*, 154 F.3d at 1233, Mr. Salazar's backing up could have suggested a nascent attempt to

flee, an effort to buy time so that he could dispose of contraband or formulate an explanation to provide to the officer, or simply a period of indecision before he determined what to do. In light of these reasonable interpretations of Mr. Salazar's backing up his pickup truck, we agree with the government that he did not submit to Trooper Berner's authority until he complied with the command to get out of the truck. *Cf. United States v. Letsinger*, 93 F.3d 140, 145 (4th Cir. 1996) (holding that, in order to constitute submission, "the suspect must *clearly* acquiesce to the officer's show of authority") (emphasis added).

Finally, we also agree with the government that this circuit's decision in *United States v. Morgan*, 936 F.2d 1561 (10th Cir. 1991), is distinguishable. *See* Aplt's Br. at 23 (stating that *Morgan* is "in seeming, but not actual, conflict" with cases holding that a suspect's temporary hesitation does not constitute submission to authority). In *Morgan*, the suspect was the passenger in a car that police suspected had been involved in a series of bank robberies. When a police officer saw the car, he activated his emergency lights. The suspect's car pulled into a driveway, where the driver and the defendant Mr. Morgan got out. When the officer told the men to "hold up," Mr. Morgan responded, "What do you want?" and then began backing away. *Id.* at 1565. The officer told Mr. Morgan not to run, but Mr. Morgan fled, carrying a tan bag. The officer pursued Mr. Morgan on foot. Mr. Morgan ran toward a house, but, after he was unable to enter, he

discarded the bag. The officer eventually caught Mr. Morgan and placed him in handcuffs.

We affirmed the district court's denial of Mr. Morgan's motion to suppress, holding that (1) the initial encounter between the officer and Mr. Morgan was a valid investigative stop and detention; and (2) at the point that the officer caught Mr. Morgan and placed him in handcuffs, there was probable cause to arrest him. *Id.* at 1567-69.

As to the first holding, the *Morgan* panel explained that the defendant had briefly submitted to the officer's authority while being questioned:

> [T]he intrusion on Mr. Morgan in regard to the initial attempted questioning by Officer Eubanks and the subsequent exchange between the two was minimal. However, since Officer Eubanks had followed the car in which Defendant was a passenger for several blocks with his red lights flashing; since Officer Eubanks exited from a marked police car, in uniform, and asked the Defendant to hold up; and since Defendant, at least momentarily, yielded to the Officer's apparent show of authority, we find Mr. Morgan was seized for purposes of the Fourth Amendment during the initial portion of the encounter.

*Id.* at 1567 (emphasis deleted).

As the government notes, our conclusion that Mr. Morgan briefly submitted to the officer's authority was based on his brief conversation with the officer (*i.e.*, asking "What do you want?" in response to the command to "hold up," *id.* at 1565). As discussed above, the relevant standard for determining when

a suspect has yielded to a show of authority is an objective one, viewed from the perspective of a reasonable officer under the circumstances. *See Cardoza*, 129 F.3d at 14 n.4. As *Morgan* suggests, a reasonable officer may well view an attempt at conversation, even if brief, as yielding to a show of authority. Here, in contrast, there was no similar conversation between Trooper Berner and Mr. Salazar. In our view, the fleeting pause of a moving vehicle would, in general, not indicate submission to a reasonable officer. Therefore there is no conflict between our conclusion here and the decision in *Morgan*. Moreover, the *Morgan* holding involved a pedestrian rather than a motorist, and, as a result, its reasoning as to when a submission to authority occurred is not directly applicable here.

**D. At the time that Mr. Salazar submitted to Trooper Berner's authority, Trooper Berner had reasonable suspicion to detain him.**

The government further argues that, because the district court erred in determining the time of seizure, it also erred in concluding that Trooper Berner lacked reasonable suspicion to detain Mr. Salazar. In response, Mr. Salazar contends that, even if the government is correct in contending that a seizure did not occur until he complied with Trooper Berner's order to get out of his truck, his backing up the pickup should not be considered as a factor supporting the decision to detain him. He observes that he "did not recklessly flee at high speeds, assault an officer, pull a gun or commit any additional crimes after he was seized." Aple's Br. at 24. Citing the decisions on which the district court relied, he

-19-

contends that the circumstances invoked by the government do not establish the reasonable suspicion required by the Fourth Amendment.

Mr. Salazar also makes several policy arguments. He invokes the Supreme Court's decision holding that a citizen need not provide his or her name to a law enforcement officer who lacks reasonable suspicion to effect a detention, *see Brown v. Texas*, 443 U.S. 47 (1979), and he argues that he was entitled to "hesitate[]" when Trooper Berner approached him. *See* Aple's Br. at 26. Citing Professor LaFave, Mr. Salazar further contends that "police may not provoke a reaction from a citizen and then use that reaction to justify a search." Aple's Br. at 25 (citing LaFave, *Search and Seizure* § 9.5(f), at 531). We are not persuaded by these contentions.

In determining whether reasonable suspicion justifies an investigative detention, we examine the totality of the circumstances, asking "whether the detaining officer has a particularized and objective basis for suspecting wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). Even in instances in which the conduct alleged to justify the stop is ambiguous, there may be sufficient grounds to support a detention so that officers may resolve the ambiguity. *United States v. Dennison*, 410 F.3d 1203, 1208 (10th Cir. 2005). Additionally, a suspect's evasive behavior as an officer approaches may be considered in determining reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (stating that "nervous, evasive

behavior is a pertinent factor in determining reasonable suspicion"). Moreover, this court has considered a suspect's failure to promptly stop a car in response to an officer's flashing lights as part of the reasonable suspicion inquiry. *See United States v. Walraven*, 892 F.2d 972, 975-76 (10th Cir. 1989).

In *Dennison,* 410 F.3d at 1207-09, we applied these principles to circumstances that resemble those at issue here. An officer observed two suspects seated in a truck with its lights off at 3:00 a.m. The suspects' truck was parked adjacent to an apartment parking lot that was a frequent target for nocturnal car theft. The police officer pulled up alongside the truck and asked the two men what they were doing. The suspects stated that they were waiting for a tow truck because they had lost their keys for a second truck, which was parked a substantial distance away.

After the initial encounter with the police officer, the suspects started the truck, turned the lights on, and moved closer to the second truck (which was parked in the same lot). Observing this conduct, the police officer approached the suspects' truck a second time and began asking them questions.

The district court in *Dennison* concluded that the officer's second encounter with the suspects was a lawful investigative detention based upon a reasonable suspicion of illegal activity. Viewing the record in the light most favorable to the government, we affirmed that ruling, concluding that "the aggregate facts support

[the police officer's] reasonable suspicion that the men's initial explanation was not complete and that criminal activity was afoot." *Id.* at 1208.

Here, in contrast to *Dennison*, we view the record in the light most favorable to Mr. Salazar (the prevailing party in the district court) rather than the government. *See Hauk*, 412 F.3d at 1185. Nevertheless, as the government argues, Trooper Berner's initial observations of Mr. Salazar's pickup truck in the parking lot raised legitimate concerns about potential illegal activity.

In particular, Trooper Berner observed a pickup pull into a parking lot adjacent to a closed business, back up the length of the parking lot, stop next to a commercial vehicle, and turn its headlights off. Subsequently, the truck's door appeared to open and, in Trooper Berner's view, sufficient time passed for the driver to have taken property from the commercial vehicle. Even though we must view these facts in the light most favorable to Mr. Salazar, *see id.*, when they are combined with Mr. Salazar's evasive action of backing away from Trooper Berner's patrol car, they provided sufficient grounds to suspect that "criminal activity was afoot." *Dennison,* 410 F.3d at 1209; *see also Wardlow*, 528 U.S. at 124 (observing that evasive behavior is relevant in determining reasonable suspicion).

Mr. Salazar's policy arguments do not alter our conclusion. Although the Supreme Court's decision in *Brown* holds that a citizen need not provide his or her name to a law enforcement officer who lacks reasonable suspicion to effect a

detention, that decision does not establish a right to "hesitate" in response to an officer's show of authority. Nor does *Brown* override the well-established principle that evasive behavior may contribute to reasonable suspicion. *See Wardlow*, 528 U.S. at 124.

Similarly, Professor LaFave's trenchant observations about Supreme Court precedent cannot help Mr. Salazar. *See* LaFave, *Search and Seizure*, § 9.5(f), at 530-31 (discussing *Wardlow*'s holding that a suspect's unprovoked flight may contribute to reasonable suspicion). As we understand it, Professor LaFave's view is that, standing alone, a suspect's response to police pursuit should not be sufficient to establish reasonable suspicion. *See id.* at 531 ("*Hodari D.* says that police pursuit, even when it makes apparent to the suspect a police intent to seize him, is not subject to Fourth Amendment limits. Surely it does not follow that such provocative activity may be deemed to provide the reasonable suspicion the police will need once they catch up with the suspect and take control of him."). Here, however, the government does not rely solely on Mr. Salazar's response to Trooper Berner's flashing lights to establish reasonable suspicion. Under *Hodari D.,* all of the circumstances preceding Mr. Salazar's getting out of his pickup truck may be properly considered in the reasonable suspicion inquiry.

### III. CONCLUSION

We therefore conclude that (1) Mr. Salazar was not detained until he obeyed Trooper Berner's command to get out of his truck; and (2) at that point, Trooper

Berner had reasonable suspicion to detain him. Accordingly, we REVERSE the district court's order granting in part Mr. Salazar's motion to suppress, and we REMAND the case to the district court for further proceedings consistent with this opinion.