FILED
United States Court of Appeals
Tenth Circuit

July 30, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

MICHAEL L. MARTIN,

    Defendant-Appellant.

No. 09-3310

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:08-CR-40034-JAR-1)**

---

Ronald E. Wurtz, Assistant Federal Public Defender (Cyd Gilman, Federal Public Defender, with him on the briefs), Topeka, Kansas, for Defendant-Appellant.

Jared S. Maag, Special Assistant United States Attorney (Lanny D. Welch, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

---

Before **O'BRIEN,** Circuit Judge, **BRORBY,** Senior Circuit Judge, and **GORSUCH**, Circuit Judge.

---

**GORSUCH**, Circuit Judge.

---

Confronted at the entryway of his apartment building by officers who suspected him of a shooting earlier in the day, Michael Martin was arrested, searched, and found carrying a gun. Charged with being a felon unlawfully in

possession of a firearm, Mr. Martin moved to suppress evidence about the weapon from his anticipated trial, claiming his seizure and subsequent search violated the Fourth Amendment. The district court denied the motion, and today we affirm. The arresting officers in this case had probable cause to arrest Mr. Martin as a suspect in the shooting, and they faced exigent circumstances sufficient to justify effecting that arrest inside the apartment building's entryway. Because of this, we conclude, the officers' actions complied with, not violated, the Fourth Amendment.

I

A

Reviewing the facts in the light most favorable to the government (as we must given that it prevailed before the district court, *see, e.g.*, *United States v. Colonna*, 360 F.3d 1169, 1173 (10th Cir. 2004)), they tell us this much. In the late afternoon of December 29, 2007, members of the Topeka, Kansas police department learned that Lawrence Medlock, Jr., had been shot in the chest. People in the vicinity of the shooting told police that the suspect was an African-American male with the street name "Kalil." Witnesses added that Kalil fled the scene on foot with the guns he had used in the shooting. Kalil was, they said, wearing a heavy winter coat, brown or gray, with fur lining. Officers running a check on the alias "Kalil" in a police database found the name Michael Johnston as a possible match. Officers also learned that this particular Michael Johnston

lived in the area of the shooting and appeared to be the boyfriend of Ora Mae Hudnall. (It later came out in testimony from Ms. Hudnall's stepfather that she and Mr. Martin were married and lived together, but this the police didn't know at the time.)

The officers located a photograph of Ms. Hudnall and the address of her apartment. Two members of the Topeka police department then set out to that address, hoping to "get a statement from her and any information [they] could on — on this shooting suspect." R. Vol. II at 8. The officers arrived at Ms. Hudnall's apartment building approximately four hours after the shooting. The main entrance to the building was locked. The officers looked around to see if any lights were on in the complex, but couldn't get the attention of any resident. Moments later, they heard voices approaching the main entrance door. When the door opened, revealing an entryway or atrium, the officers saw a woman matching the photo of Ms. Hudnall accompanied by an African-American male wearing a heavy fur-lined coat. An officer asked the man's name, and he responded "Michael Martin," though one officer apparently only heard the suspect say "Michael."

As he said his name, Mr. Martin stepped further back into the atrium. One of the officers feared that the defendant was retreating, so he identified himself as a police officer and told Mr. Martin to "put his hands — turn around and put his hands on the wall behind him." R. Vol. II at 12. Mr. Martin didn't do that.

Instead, Mr. Martin dropped his hands out of sight and, with his hands down, he stated, "[I] ha[ve] something on [me]." R. Vol. II at 12. Unable to see Mr. Martin's hands, and interpreting the statement that he had something on him to mean he had a gun, an officer entered the atrium to "close[] the distance between himself and myself." R. Vol. II at 12. Both officers then placed Mr. Martin in handcuffs. During a search of Mr. Martin, they discovered an automatic pistol and an ammunition magazine.

B

All this led to Mr. Martin's indictment in federal court under 18 U.S.C. § 922(g), as a felon in possession of a firearm. (Separate state charges for aggravated assault with a deadly weapon, among other things, were brought but eventually dropped.) Mr. Martin responded to the indictment with a motion to suppress. Presenting evidence that he lived in the apartment with Ms. Hudnall, Mr. Martin argued that he had a reasonable expectation of privacy, not just in his particular apartment, but also in the building's various common areas as part of his "home." Yet, he submitted, the officers entered one such common area (the building's entryway or atrium) and effected an arrest of him without a warrant. And this, he argued, violated his Fourth Amendment rights.

The district court disagreed. It denied the motion to suppress, holding that Mr. Martin had no reasonable expectation of privacy in the apartment building's common areas. Alternatively, even assuming Mr. Martin could have reasonably

possessed such an expectation of privacy, the district court held that the motion still failed because the officers had probable cause to arrest Mr. Martin, and exigent circumstances — officer safety — justified their entry into the building and their seizure of Mr. Martin there. Mr. Martin moved for reconsideration, which the district court granted, but ultimately the court only elaborated on and confirmed its prior holding. In light of all this, Mr. Martin pled guilty to the gun charge while reserving his right to appeal the denial of his suppression motion. Mr. Martin now pursues that reserved right before us.

II

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Under the Fourth Amendment, there are "strict limits" on when law enforcement officers may reasonably (and thus lawfully) enter a home without a warrant, *United States v. Walker*, 474 F.3d 1249, 1252 (10th Cir. 2007); exceptions to the warrant requirement in these circumstances are "few in number and carefully delineated." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (quotation marks omitted). But one well established exception, justifying warrantless entry into the home, exists when the officers have probable cause to effect an arrest and face "exigent circumstances." *United States v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008). Examples of exigent circumstances include a threat to officer safety, an ongoing

"hot pursuit" of a fleeing suspect, or the possible imminent destruction of evidence. *Georgia v. Randolph*, 547 U.S. 103, 116 n.6 (2006).

None of these conditions, Mr. Martin contends, is present in his case. In his view, the apartment entryway qualifies as part of his home and the government lacked the probable cause or exigent circumstances necessary to effect a warrantless seizure of him there. For its part, the government disputes all of this. It contends that Mr. Martin did not have a reasonable expectation of privacy in the apartment building's common areas. Given this, the government submits, the entryway was like any other public place, and all it needed to justify Mr. Martin's arrest was probable cause, and that it had. Even if Mr. Martin did have a reasonable expectation of privacy in the apartment building's atrium, the government adds, the officers in this case faced exigent circumstances justifying their entry.

We find it unnecessary to resolve whether Mr. Martin possessed a reasonable expectation of privacy in the apartment building's atrium or entryway, as the parties variously describe it.[1] Likewise, we need not decide whether the

---

[1] There appears to be some disagreement among our sister courts about the Fourth Amendment status of apartment building common areas. *Compare United States v. Garner*, 338 F.3d 78, 80 (1st Cir. 2003) (no reasonable expectation in basement common area of apartment building); *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993) (no reasonable expectation in hallway of high-rise apartment building); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (no reasonable expectation of privacy in the common hallway of a locked apartment building), *with United States v. Carriger*, 541 F.2d 545, 552 (6th Cir.

(continued...)

officers arrested Mr. Martin sufficiently close to the building's threshold that the arrest occurred in a "public place." *See United States v. Santana*, 427 U.S. 38, 42 (1976) (threshold is a "'public' place"); *McKinnon v. Carr*, 103 F.3d 934, 935 (10th Cir. 1996); 3 Wayne R. LaFave, *Search and Seizure* § 6.1(e) at 301-04 (4th ed. 2004). And neither must we decide whether or when an officer can effect a warrantless arrest by show of force, from outside the home, of a person inside the home, without exigent circumstances. LaFave § 6.1(e) at 301-04. This is because, even assuming the entryway was part of Mr. Martin's "home," and even assuming his arrest wasn't in a public place by dint of its proximity to the threshold, by the time the officers seized Mr. Martin they had both probable cause to effect the arrest and faced exigent circumstances supporting their entry into the building.

In reaching the narrow holding we do, we proceed in three steps, asking: (a) when was Mr. Martin seized for Fourth Amendment purposes? (b) did the officers have probable cause to effect an arrest at the time of that seizure? (c) and did exigent circumstances then exist sufficient to permit the officers' intrusion into the (presumed) home? All of these are legal questions we are obliged to, and do, decide *de novo*, while, again, viewing the evidence in the light most favorable to the government.

---

[1](...continued)
1976) (finding a reasonable expectation of privacy in the common hallway of a locked apartment building).

A

"[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). A restraint on liberty, of course, "readily bears the meaning of a laying on of hands or application of physical force to restrain movement" that succeeds in doing so. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). But "where that is absent," a seizure can still be found where the individual has demonstrated a "*submission* to the assertion of authority." *Id.*

A submission to a show or assertion of authority requires that a suspect "manifest compliance with police orders." *United States v. Salazar*, ___ F.3d ___, 2010 WL 2473162, at *6 (10th Cir. 2010) (quoting *United States v. Waterman*, 569 F.3d 144, 146 n.3 (3d Cir. 2009)). That is, the suspect must take actions that show he has placed himself "*under* the control of a person in authority or power; to become subject, surrender [himself], or yield *to* [that] person or his rule." XVII Oxford English Dictionary 45 (2d ed. 1989) (defining "to submit"). Our precedent dictates, as well, that we determine whether a citizen has so submitted "by examining the view of a reasonable law enforcement officer under the circumstances." *Salazar*, ___ F.3d at ___, 2010 WL 2473162, at *5, *7

(a reasonable officer is one who is "prudent, cautious, and trained" (citation omitted)).

In light of these legal principles governing us, when was Mr. Martin seized? We conclude it wasn't until the officers took hold of him and placed him in handcuffs. At that point, Mr. Martin was indubitably restrained by physical force. To be sure, Mr. Martin contends that he was seized earlier than this, at the moment the officers ordered him to place his hands on the wall. And in doing so he stresses that a seizure doesn't require actual physical restraint, only submission to a show of authority. But the difficulty with this argument is that, when the officers asked Mr. Martin to turn around and place his hands on the wall, Mr. Martin didn't do so. Instead, he dropped his hands out of sight and indicated he had "something on" him. As the arresting officer testified:

Q.   Does he do – does he actually put his hands on the wall?

A.   No. He turns around and puts his hands down where I can't see them because I'm behind him and he's turned around. And he makes a statement that he has something on him.

Q.   Okay. And your training and experience as a detective and an officer with the police department, what does it mean to you when somebody says they have something on them?

A.   Meaning he has a gun on him.

Q.   What did you do in reaction to his decision to turn around and put his hands down?

A.   I continued to give him orders to show me his hands, and I had closed the distance between himself and myself in that small

atrium area. Grabbed his left wrist from in front of him and took it around behind his back. . . . We maneuvered him into handcuffs at that point. Detective Hazim then removed a large ammunition magazine from the right side of his body and I removed an Intratec 9 millimeter, TEC-9 auto pistol from his left coat pocket.

R. Vol. II at 12-13.

On cross-examination, the officer added more:

Q. "Put your hands on the wall." He turns and puts his hands down, is that what you're saying?

A. Right.

Q. Right?

A. And he says, "I've got something on me."

Q. Okay.

A. And I say, "Show me your hands," as I'm moving into the common area and he won't. And I get his left hand behind him and I lean up against the wall so my partner can get his right hand. We secure him in handcuffs and finally got him unarmed.

R. Vol. II at 37-38.

From the viewpoint of a reasonable officer, or any reasonable person, Mr. Martin's reaction to the order to place his hands on the wall was not a *submission* to that order. Mr. Martin did not surrender, yield, or subjugate himself to that command. In fact, a reasonable officer, or any other reasonable person, would have perceived (as the officer here did perceive) Mr. Martin's action — placing his hands where they couldn't be seen, rather than on the wall where they could

- 10 -

be seen — to be the *opposite* of submission, quite possibly an imminent threat to the officer's safety.  We therefore conclude that Mr. Martin was not seized at the moment the officer ordered him to turn and place his hands on the wall, but was seized only once he was physically restrained inside the entryway.

Our holding on this score finds a parallel in *Salazar.*  There, an officer sought to effect a traffic stop, flashing the lights on his patrol car.  *Salazar*, ___ F.3d at ___, 2010 WL 2473162, at *2.  The defendant argued that he submitted to the officer's authority, and thus was seized, when he sought to pull his truck alongside the officer's car, noting he wasn't fleeing but only repositioning his truck so he might engage the officer.  *Id.* at *3.  We rejected the defendant's claim that this conduct would be viewed by a reasonable officer as submission to the officer's show of authority.  *Id.* at *7.  In doing so, we noted,

> Trooper Berner explained that, as Mr. Salazar's truck began to back away, he was concerned that "this vehicle was trying to allude [him]," and that, at that point, "[He's] not quite sure what [Mr. Salazar's] doing or why he's doing what he's doing."  We find that assessment entirely reasonable.  From the point of view of a prudent, cautious, and trained officer  Mr. Salazar's backing up could have suggested a nascent attempt to flee, an effort to buy time so that he could dispose of contraband or formulate an explanation to provide to the officer, or simply a period of indecision before he determined what to do.  In light of these reasonable interpretations of Mr. Salazar's backing up his pickup truck, we agree with the government that he did not submit to Trooper Berner's authority until he complied with the command to get out of the truck.

*Id.* (internal citations and alterations omitted). Much the same might be said here. Mr. Martin's action of dropping his hands from sight, rather than placing them on the wall, suggested not compliance but its opposite.

B

Having decided this much, the next question becomes: did the officers have probable cause to effect an arrest at the time they seized Mr. Martin? Probable cause to arrest exists where, "under the totality of the circumstances," a "reasonable person" would believe "that an offense has been . . . committed" by "the person arrested." *United States v. Munoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (quotation marks omitted); *see also Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). As the standard itself indicates, *probable* cause does not require metaphysical certitude or proof beyond a reasonable doubt. "[P]robable cause is a matter of probabilities and common sense conclusions, not certainties." *United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009) (internal quotation marks omitted)). At the same time, probable cause requires, of course, more than mere suspicion that unlawful activity is afoot. *See, e.g.*, *Munoz-Nava*, 524 F.3d at 1144 (quotation marks omitted).

We have no difficulty concluding that the officers had reason to think Mr. Martin was very probably the suspect wanted in the shooting. Prior to arresting Mr. Martin, the officers knew that a shooting had occurred four hours earlier by an assailant who (1) fled with the weapons used in the crime, (2) was wearing a

fur-lined winter coat, (3) was an African-American male with the first name "Michael," (4) was known to be the boyfriend of Ms. Hudnall, who herself (5) lived in the particular apartment building they were visiting. And the officers knew that the individual before them (6) matched this description and (7) claimed to be carrying a gun. We have found probable cause in circumstances similar to these. *See, e.g.*, *United States v. Allen*, 235 F.3d 482, 488 (10th Cir. 2000) (finding probable cause when an "individual meeting the physical description given" and his suspected vehicle, also matching the description, were both found at the location provided by a tipster).

Mr. Martin protests that he didn't meet the description the officers had because police database information connected the street name "Kalil" to a Michael Johnston, and his name is Michael Martin. But we aren't entitled to focus on this defect in isolation. In assessing probable cause we must look to the totality of the circumstances. *Maryland v. Pringle*, 540 U.S. 366, 372 n.2 (2003). And so we must also account for the fact that the officers found themselves faced with a man who answered to the same first name as the one they sought; who resembled and was wearing the same clothes as the suspect; who was accompanied by Ms. Hudnall, whom police databases associated with the suspect; and who indicated he possessed a firearm, as the fugitive shooter had. And we must also acknowledge that it is hardly unknown for individuals confronted by police to offer false names, *see, e.g.*, *Allen*, 235 F.3d at 486 (telling officers his

- 13 -

name was Gerald instead of Gavin); *United States v. Hooks*, 780 F.2d 1526, 1534 (10th Cir. 1986), or for large and useful databases to contain minor errors, *see, e.g.*, *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1208 (10th Cir. 2007). The officers' information may not have been perfect. But the Fourth Amendment doesn't require perfection, only probable cause.

In a separate but related vein, Mr. Martin stresses that the officers' information connecting Ms. Hudnall to the suspected assailant was merely "historical" and didn't indicate any connection between Ms. Hudnall and the shooting itself. Opening Br. at 20. Because of this, he says, we should disregard this bit of information altogether. But Mr. Martin misconstrues the significance of the information police had about Ms. Hudnall. Ms. Hudnall was never a suspect in the shooting. Her relevance in the probable cause calculus is only — but significantly — that she was thought by police to be the girlfriend of the fugitive, and so her presence tended to confirm that the person the officers faced at the doorway was the wanted man. *Cf. Allen*, 235 F.3d at 488 (association between defendant and car relevant to probable cause determination). This isn't to say Ms. Hudnall's presence was sufficient by itself to give rise to probable cause, but it is to say it isn't an irrelevant or immaterial piece of information either.

C

Having determined that officers had probable cause to effect an arrest when they seized Mr. Martin, the question remains whether "exigent circumstances" existed to justify doing so in a place Mr. Martin claims to be part of his home. The government argues that imminent and genuine officer safety concerns gave rise to exigent circumstances sufficient to justify the officers' entry into Mr. Martin's (putative) home, and we agree. Under our precedent, to demonstrate that officer safety concerns qualify as exigent circumstances permitting entry into a home without a warrant, the government must show "(1) the officers had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves . . . and (2) the conduct of the entry was reasonable." *Reeves*, 524 F.3d at 1169 (internal quotation marks omitted); *see also Payton* 445 U.S. at 586 n.25; *Walker*, 474 F.3d at 1253. Both of these conditions are satisfied in this case.

First, the arresting officer testified that, based upon his experience, when a suspect states that he has "something on him," that usually means "he has a gun." R. Vol. II at 12; *see also Harman v. Pollock*, 586 F.3d 1254, 1265 (10th Cir. 2009) ("[Courts] must defer to trained law enforcement personnel, allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. . . ." (internal quotation marks omitted)). No one seriously disputes as

- 15 -

much. Before entering the building, then, the officers had come face to face with a man who had likely shot someone else earlier in the day, who claimed he had a gun on him, and who, after being told to place his hands on the wall, dropped his hands from sight. In these circumstances, the "officers had an objectively reasonable basis to believe that there was an immediate need to enter to protect [their] safety." *Reeves*, 524 F.3d at 1169; *see also Walker*, 474 F.3d at 1251-53 (exigent circumstances permitting entry into home existed after man inside the house, in response to the officer announcing his presence outside, shouted, "Yeah, and I got a goddamn gun"); *United States v. Thomas*, 372 F.3d 1173, 1175, 1178 (10th Cir. 2004) (warrantless entry permitted after defendant brandished a weapon).

Mr. Martin protests that the officers should have retreated. But, as the district court observed, "[r]etreating when the officers thought that [the] defendant had a weapon could have been more dangerous under the circumstances. . . . Officers are not required to turn and run from suspected criminals, nor are they required to take unnecessary risks in the field when posed with a threat to themselves or others." R. Vol. I at 80-81. We agree. Whether or not retreat would've been a reasonable option in these circumstances (it is easy enough to think, as the district court did, that retreating could've been an unreasonable and more dangerous option), it was surely a reasonable alternative for the officers to believe that they needed to enter the building immediately to

- 16 -

disarm Mr. Martin for their own safety and the safety of others. *See Walker*, 474 F.3d at 1253 ("Although retreat was an alternative, it was also reasonable for them to take control of the situation by entering to disarm Mr. Walker, who could otherwise continue to pose a danger to the officers and others."). "Not infrequently, a prompt entry to arrest is called for in order to minimize the risk that someone will be injured or killed." LaFave § 6.1(f) at 324.

Second, the intrusion into Mr. Martin's (presumed) home was extremely modest. The officers didn't go barreling in and rummaging through an apartment searching for him. Instead, they ventured (through an open door) just a short distance into an atrium to effect their arrest, and did so only long enough to secure Mr. Martin. The officers neither forced their way in nor even drew their weapons. They sought only to gain control of Mr. Martin in light of their reasonable apprehension that he was armed and dangerous. Their response was, in this light, amply tailored to the exigency they faced. *See, e.g.*, *United States v. Najar*, 451 F.3d 710, 720 (10th Cir. 2006) (noting manner of entry and scope of search was reasonable because officers did not attempt to search the trailer beyond any place where a victim might be found).

Mr. Martin argues that "police actions, and perhaps a bit of the police imagination" created the exigency the officers faced, and he emphasizes that he didn't flee from the officers. Reply Br. at 12. But while it is true that law enforcement officers may not "create" the exigency justifying their intrusion into

a home, *see United States v. Bonitz*, 826 F.2d 954, 957 (10th Cir. 1987); *see also* LaFave § 6.1(f) at 318 *et seq.*, that isn't what happened here. The officers testified that they went to Ms. Hudnall's apartment building looking to "get a statement from her and any information [they] could on — on this shooting suspect." R. Vol. II at 8. There is no evidence that the officers knew at the time that Mr. Martin resided at the apartment with Ms. Hudnall, let alone that he would be present at the apartment when they arrived. *Compare* LaFave § 6.1(f) at 318, 319 n.224 (discussing officer creation of exigent circumstances in "planned arrests"). Instead, by all accounts, the officers came abruptly on the suspected fugitive shooter at close range, startling perhaps everyone in the process. The suspect then failed to comply with police orders but revealed he had a firearm — circumstances not of the officers' making but Mr. Martin's. The fact that Mr. Martin didn't flee hardly rendered this tense situation safe or the officers' belief that Mr. Martin posed a threat to their safety unreasonable.

Where, as here, the circumstances giving rise to the claimed exigency occur not as a direct result of a long-planned arrest but "while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest," Professor LaFave has suggested, and we agree, "there should be a far greater reluctance to fault the police for not having a warrant. Here, the presumption should be in favor of a warrantless arrest rather than against it, as the probabilities are high that it is not feasible for the police to delay the arrest while

one of their number leaves the area, finds a magistrate and obtains a warrant, and then returns with it." LaFave § 6.1(f) at 320-21. In this case, we cannot say the officers acted unreasonably when seeking to protect themselves in the face of rapidly unfolding events during a field investigation into a gun crime.

* * *

Mr. Martin's motion to suppress evidence obtained as a result of his seizure was properly denied and the district court's judgment is

*Affirmed.*