**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOSE JESUS CRUZ,

    Defendant - Appellant.

No. 19-2127

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:18-CR-01105-JB-1)**
_____

Carey C. Bhalla, Albuquerque, New Mexico, appearing for Appellant.

Tiffany L. Waters, Assistant United States Attorney (John C. Anderson, United States Attorney, with her on the briefs), Office of the United States Attorney for the District of New Mexico, Albuquerque, New Mexico, appearing for Appellee.
_____

Before **BRISCOE**, **MURPHY**, and **MATHESON**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

Defendant-Appellant Jose Jesus Cruz entered a conditional guilty plea to possession of heroin with intent to distribute and to possession of a firearm during a drug trafficking crime. Mr. Cruz appeals the district court's denial of his motion to suppress evidence, arguing that evidence should have been excluded because it was

the result of an unlawful search and seizure. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

Mr. Cruz was charged in a four-count superseding indictment: Count 1, being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); Count 2, possession of fifty grams or more of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); Count 3, possession of heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); Count 4, using and carrying a firearm during and in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). ROA, Vol. I at 46–47. Mr. Cruz moved to suppress evidence police recovered during a search of Mr. Cruz's residence and vehicle, arguing that police officers made a warrantless entry into his home unsupported by probable cause and that no exigent circumstances justified the entry. *Id.* at 11–24.

At the hearing on the motion to suppress, Detective Gerald Koppman of the Bernalillo County Sheriff's Department testified to the following: In the fall of 2016, Detective Koppman learned that a person named "Chino," who was subsequently identified as Mr. Cruz, was trafficking narcotics. *Id.*, Vol. III at 13. Mr. Cruz was on federal probation at the time, and Detective Koppman arranged to meet with him to obtain information about another drug trafficker who was a target of Detective Koppman's investigation. *Id.* at 13–14. Mr. Cruz admitted to trafficking and selling drugs. *Id.* at 14. Detective Koppman concluded any contact with Mr. Cruz after the

2

target was apprehended. *Id.* at 15. Approximately a year later, in early August 2017, a confidential informant (CI) told Detective Koppman about a person named "Chino" who was selling large quantities of narcotics. *Id.* at 16. Detective Koppman showed the CI a photograph of Mr. Cruz, whom the CI identified as "Chino." *Id.* The CI stated that he[1] had met Mr. Cruz outside of Mr. Cruz's residence at Lansing and Airway to purchase methamphetamine. *Id.* at 16–17. The CI also provided a phone number for Mr. Cruz. *Id.*, Vol. I at 28. The CI believed Mr. Cruz was obtaining narcotics through a trafficker from Arizona who moved hundreds of pounds of narcotics through Albuquerque monthly. *Id.*, Vol. III at 20.

On September 5, 2017, Detective Koppman executed a search warrant on another suspect and found a large quantity of methamphetamine. *Id.* at 16, 46. The suspect agreed to cooperate with Detective Koppman as a Confidential Source (CS). The CS named "Chino" as his supplier, and when shown a photograph of Mr. Cruz, the CS said that was the person he knew as "Chino." *Id.* at 16. The CS stated that he regularly conducted narcotic transactions with Mr. Cruz at the intersection of Lansing and Airway. *Id.* at 16–17. The CS also showed Detective Koppman text messages on his phone from Mr. Cruz, discussing the amount of methamphetamine that the CS was ordering from Mr. Cruz and describing the methamphetamine. *Id.*, Vol. I at 29. The CS provided three different phone numbers used by Mr. Cruz, including one that matched the number provided by the CI. *Id.* Both the CS and Detective Koppman

---

[1] The record is not clear as to the gender of the CI, and the pronoun "he" is used throughout the opinion for ease of reference.

3

believed Mr. Cruz did not keep drugs at his home because, given his probation status, it was subject to search at any time. *Id.*, Vol. III at 17, 27, 37.

Detective Koppman asked the CS to call Mr. Cruz and request that Mr. Cruz bring a few ounces of methamphetamine to the CS. *Id.* at 17, 22, 26. Detective Koppman listened as the CS ordered several ounces of methamphetamine from Mr. Cruz. *Id.* at 17, 26. Mr. Cruz agreed to provide the methamphetamine after he returned from work and told the CS he would call him later. *Id.* at 17.

Detective Koppman, however, did not plan to conduct a controlled buy. His objective was to conduct an investigative detention with Mr. Cruz and convince Mr. Cruz to "flip" on a bigger target. *Id.* at 29–30. Detective Koppman did not want to arrest Mr. Cruz if he was willing to flip, and he did not intend to search Mr. Cruz's home because he did not believe Mr. Cruz would store drugs there. *Id.* at 30–31, 47.

Detective Koppman and other officers went to Mr. Cruz's residence to conduct surveillance while waiting for the arranged drug deal between Mr. Cruz and the CS. *Id.* at 17–18. Shortly after Detective Koppman arrived at the residence, the CS called Detective Koppman and told him that Mr. Cruz instructed the CS to meet in front of the residence in fifteen minutes. *Id.* at 22, 24. Approximately fifteen minutes later, Detective Koppman observed Mr. Cruz come out of his residence, open his gate, and walk out onto the street. *Id.* at 24. According to Detective Koppman, Mr. Cruz began looking around as if he were waiting for someone, consistent with behavior expected of someone about to engage in a narcotics transaction. *Id.* at 24–25.

4

At this point, Detective Koppman began to walk up to Mr. Cruz to speak with him. *Id.* at 25. But when Mr. Cruz saw the law enforcement officers, he ran back onto his property. *Id.* Detective Koppman instructed Mr. Cruz to stop and get on the ground, but Mr. Cruz kept running. *Id.* at 47.

Detective Koppman believed, based on his experience, that Mr. Cruz was going to destroy evidence. *Id.* at 26. He explained, "If [narcotics traffickers are] running away from us, it's usually because they have evidence that they don't want to be found with, and they want to try to get rid of it. Usually flushing it. Flushing it or throwing it over a fence, throwing it on a roof. I've seen it all." *Id.*

After Mr. Cruz ran, officers chased him as he ran, and then followed him as he entered his home. *Id.* at 32. They saw Mr. Cruz come out of his bathroom and took him into custody. *Id.* at 32–33. Mr. Cruz's arm was wet up to the elbow, and officers could see what appeared to be a bag of methamphetamine in the toilet. *Id.* The officers detained Mr. Cruz, but they did not search anywhere else in the home at that time. *Id.* at 33–34, 36.

After detaining Mr. Cruz, the officers read him his *Miranda* warnings and sat him on the couch. *Id.* at 30, 34. They offered him the option of consenting to a search, or having the officers obtain a search warrant. Mr. Cruz cooperated and provided the officers with consent to search "whatever [the officers] want[ed] to search." *Id.* (quotations omitted).

Pursuant to this consent, officers searched Mr. Cruz's residence. *Id.* The bag recovered from the toilet contained ten grams of methamphetamine. *Id.*, Vol. I at 30.

Officers found two firearms in the living room; one firearm in the bedroom; approximately fifteen ounces of methamphetamine in the trunk of a vehicle; and twenty grams of methamphetamine, twenty-three grams of heroin, and a firearm in a purse in his car. *Id.* at 30–32. On Mr. Cruz's person, officers found bags in his pocket containing sixteen grams of methamphetamine and eight grams of heroin. *Id.*, at 30.

The district court denied Mr. Cruz's motion to suppress, concluding that the warrantless entry into his home was supported by probable cause and justified by exigent circumstances—specifically, the destruction of evidence and the hot pursuit of a suspect. *Id.* at 140–41, 144. Mr. Cruz subsequently entered a conditional plea to Counts 3 and 4 of the superseding indictment. *Id.* at 145–55. The district court sentenced Mr. Cruz to a total of 360 months' imprisonment. *Id.* at 156–63. Mr. Cruz has timely appealed and only challenges the district court's denial of his motion to suppress.

## II

When reviewing a denial of a defendant's motion to suppress, we view the evidence in the light most favorable to the government. *United States v. Smith*, 531 F.3d 1261, 1265 (10th Cir. 2008). We review the court's factual findings for clear error. *Id.* However, we review de novo the ultimate question of reasonableness under the Fourth Amendment. *Id.* The existence of exigent circumstances is a mixed question of law and fact. *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998). "Although we accept underlying fact findings unless they are clearly

6

erroneous, the determination of whether those facts satisfy the legal test of exigency is subject to de novo review." *Id.* (quotations omitted).

Under the Fourth Amendment and applicable case law, warrantless searches and seizures are presumptively unreasonable. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *United States v. Najar*, 451 F.3d 710, 713 (10th Cir. 2010). Warrantless searches inside the home are particularly suspect, and the Supreme Court has recognized that even with probable cause, police officers may not enter a dwelling to make an arrest absent consent or exigent circumstances. *Brigham City*, 547 U.S. at 403. Under the exclusionary rule, the government may not introduce evidence obtained in violation of the Fourth Amendment. *United States v. Esquivel-Rios*, 786 F.3d 1299, 1306 (10th Cir. 2015).

When analyzing warrantless arrests that begin outside the home and end with police chasing a suspect into his residence, we ask whether police had probable cause to make the arrest in the first place and then whether there were exigent circumstances to justify the officers' intrusion into the home. *See United States v. Martin*, 613 F.3d 1295, 1303 (10th Cir. 2010) ("Having determined that officers had probable cause to effect an arrest . . . the question remains whether exigent circumstances existed to justify doing so in [defendant's home.]"). To uphold Mr. Cruz's warrantless arrest, we must determine whether the police officers had probable cause to arrest him and whether there were exigent circumstances to justify his arrest within his house. The district court concluded that there was probable cause for Mr. Cruz's warrantless arrest, and that two exigent circumstances justified

7

the warrantless entry into his residence: (1) the destruction of evidence and (2) the hot pursuit of a suspect.  ROA, Vol. I at 140.

### III

A.  Probable Cause

Mr. Cruz argues that the district court erred in finding that there was probable cause for his arrest.  Aplt. Br. at 12.  To determine whether there was probable cause for Mr. Cruz's arrest, we look to see "whether at that moment the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [officer] in believing that the [defendant] had committed or was committing an offense."  *United States v. Snow*, 82 F.3d 935, 942 (10th Cir. 1996) (last alteration added) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  "Probable cause must be evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer," *United States v. Morgan*, 936 F.2d 1561, 1568 (10th Cir. 1991), and "[p]robable cause determinations are properly made using a totality-of-the-circumstances analysis," *id.* at 1569.  "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

Moreover, where, as here, probable cause is based on information received from a confidential informant and a confidential source, "the court makes a probable cause determination based on the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge."  *United States v. Hendrix*,

8

664 F.3d 1334, 1338 (10th Cir. 2011). Information received from these sources which provides "highly specific or personal details from which one could reasonably infer that the informant had firsthand knowledge about the claimed criminal activity" is more likely to support probable cause. *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009). Further, information from any source (whether a mere tipster, a confidential source, or a confidential informant) is more reliable if it is confirmed, and thereby corroborated, by officers' independent observations. *Hendrix*, 554 F.3d at 1338.

Here, considering all that the officers knew when they approached Mr. Cruz outside his home, they had probable cause to arrest him at that time. The officers knew that Mr. Cruz had trafficked drugs in the past, based on his own admission to Detective Koppman in 2016. *See United States v. Artez*, 389 F.3d 1106, 1114 (10th Cir. 2004) ("[C]riminal history, combined with other factors, can support a finding of reasonable suspicion or probable cause."). In addition, Detective Koppman received highly specific information from both a CI and CS that Mr. Cruz was presently trafficking narcotics. The CI provided details supporting his claim of firsthand knowledge of Mr. Cruz's drug dealing, including a description of the location of Mr. Cruz's home; providing a phone number for Mr. Cruz; and identifying him in a photograph. *See United States v. Tuter*, 240 F.3d 1292, 1298 (10th Cir. 2001) (observing that "highly specific or personal details" can support the reasonable inference that a source has firsthand knowledge). Moreover, the information from the CI was corroborated by the CS. The CS identified a photograph of Mr. Cruz;

9

provided one of Mr. Cruz's phone numbers that matched that provided by the CI; and showed Detective Koppman text message exchanges with Mr. Cruz describing the methamphetamine and the amount the CS was ordering from Mr. Cruz. *See Artez*, 389 F.3d at 1114 (noting that information received "from a second informant can also help corroborate information from a confidential informant"). Officers also confirmed the information from both the CI and CS through independent observation by asking the CS to set up a drug buy with Mr. Cruz while officers listened. The CS called Detective Koppman and told him that Mr. Cruz had asked to meet the CS at the intersection in front of Mr. Cruz's house in fifteen minutes. At the agreed-upon time, Mr. Cruz walked out onto the street and began looking around as if waiting to meet someone, behavior Detective Koppman believed was consistent with a drug transaction. It is also relevant that Mr. Cruz fled upon seeing the officers. *See United States v. Polly*, 630 F.3d 991, 999 (10th Cir. 2011) (noting flight from police can be considered, among other factors, in probable cause analysis). In sum, considering the officers' knowledge of Mr. Cruz's criminal history; detailed, corroborated information from a CI and CS that Mr. Cruz was selling drugs; and Mr. Cruz's behavior at the prearranged drug buy, Detective Koppman had probable cause to arrest Mr. Cruz when he approached Mr. Cruz outside of his home.

Nevertheless, Mr. Cruz argues that there was no probable cause for his arrest unless and until a controlled buy was completed, *see* Aplt. Br. at 12, and that the information obtained from the CI and CS was not reliable, *see id.* at 14. These arguments are unpersuasive. As noted, "probable cause requires only a *probability* or

10

substantial chance of criminal activity, not an *actual showing* of such activity."

*Gates*, 462 U.S. at 243 n.13 (emphasis added). Mr. Cruz relies on *Aquino* to support his argument, but that case does not stand for the proposition that probable cause arises only if there is a completed controlled buy. *United States v. Aquino*, 836 F.2d 1268 (10th Cir. 1988). In *Aquino*, the police did not have evidence linking the defendant to drug trafficking until a controlled buy was completed. *Id.* at 1272–73. Here, however, there was significant evidence linking Mr. Cruz to drug trafficking even in the absence of a completed controlled buy, including detailed, corroborated information from a CI and CS; text messages between the CS and Mr. Cruz setting up drug transactions; a phone call between the CS and Mr. Cruz arranging for the sale of methamphetamine; and Mr. Cruz appearing for the transaction at the time and place arranged by the CS. *Aquino* only underscores the fact that probable cause determinations are made using a totality of the circumstances approach. Under the totality of the circumstances presented here, probable cause is more than supported.

Mr. Cruz's arguments regarding the reliability of the CI and CS are also without merit. Mr. Cruz states that the CI only provided "vague references to prior drug deals." Aplt. Br. at 15. But the information provided by the CI was quite specific, including the address of Mr. Cruz's residence and his phone number. And contrary to Mr. Cruz's assertion, the CI's information was not stale. While it was provided one month before Mr. Cruz's arrest, the information provided suggested that Mr. Cruz's drug trafficking was ongoing. *See* ROA, Vol. III at 19 (Detective Koppman testifying that the CS identified Mr. Cruz as "the subject that *sells* me

11

narcotics") (emphasis added, quotations omitted). "When the circumstances suggest ongoing criminal activity, the passage of time recedes in importance." *See United States v. Cantu*, 405 F.3d 1173, 1177 (10th Cir. 2005).

Mr. Cruz also points out that the CS had to ask Mr. Cruz for directions to his home and that Mr. Cruz came outside before the CS had parked as instructed. *See* Aplt. Br. at 16. While true, these arguments do not wholly undercut the CS's veracity. The officers corroborated what the CS told them as they watched Mr. Cruz leave his house at the appointed time, head to the street, and look for someone. As the government points out, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). Finally, it is irrelevant that the specific amount of methamphetamine in the controlled buy was not established before the arrest. *See* Aplt. Br. at 16. Again, probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.[2] Here, there was abundant evidence to support probable cause for Mr. Cruz's arrest.

---

[2] Mr. Cruz also contends that Detective Koppman admitted to a lack of probable cause for his arrest. *See* Aplt. Br. at 14. The record, however, only shows that Detective Koppman stated that *prior* to surveilling Mr. Cruz at his residence, officers lacked probable cause to *search his home*. *See* ROA, Vol. III at 37–38. Whether there was probable cause to arrest Mr. Cruz and whether there was probable cause to search his home for drugs are two separate inquiries, and here, officers did not search Mr. Cruz's home until they obtained his consent to do so. *See United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998) ("Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime."). Regardless, in addition to having probable cause to arrest Mr.

12

B. Exigent Circumstances

Having concluded there was probable cause to support Mr. Cruz's arrest, we must next ask whether there were exigent circumstances which would justify the officers' entry into Mr. Cruz's dwelling without a warrant. The district court ruled that this entry was supported by two exigent circumstances—destruction of evidence and hot pursuit.

1. Destruction of Evidence

We employ a four-part test to determine whether the likelihood of destruction of evidence justified the officers' warrantless entry. The test requires that an officer's entry be: "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse." *Aquino*, 836 F.2d at 1272. The district court found that each of the four prongs were met. ROA, Vol. I at 140. Mr. Cruz does not dispute that drug trafficking is a serious crime or that the officers' entry was limited in scope to the minimum intrusion necessary to prevent the destruction of evidence. *See* Aplt. Br. at 12–20.

i. There was clear evidence of probable cause.

---

Cruz in his home, the officers had probable cause to believe that Mr. Cruz had transported drugs into his home after witnessing his flight.

As discussed above, officers had ample evidence of probable cause to arrest Mr. Cruz for drug trafficking when he was still outside of his home. When Mr. Cruz ran indoors from the location of a planned drug sale, police officers had reason to believe that he possessed drugs and was fleeing with them.

ii. Destruction of evidence was likely.

Because Mr. Cruz's arrest was supported by clear evidence of probable cause, we now turn to the second prong of the *Aquino* test, which has two parts: (1) the destruction of evidence must be likely and (2) the crime must be serious. Mr. Cruz only disputes the former.

In determining whether the destruction of evidence was likely, "we are guided by the realities of the situation presented by the record" and "evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers." *United States v. Wicks*, 995 F.2d 964, 970 (10th Cir. 1993) (citing *United States v. Cuaron*, 700 F.2d 582, 586 (10th Cir. 1983)); *see also United States v. Creighton*, 639 F.3d 1281, 1288 (10th Cir. 2011).

Mr. Cruz contends that "there was no indication of loss or destruction of evidence when [Mr.] Cruz exited his home or stood outside." Aplt. Br. at 20. More specifically, he argues that officers did not observe a drug buy before following Mr. Cruz into his home and did not see any other signs consistent with the destruction of evidence. *Id.*

Under the circumstances presented, however, Detective Koppman's belief that Mr. Cruz would try to destroy evidence was justified. While a drug buy was not

14

completed, officers reasonably believed that Mr. Cruz went out to the street to engage in a prearranged drug transaction; he appeared at the agreed-upon time and place and appeared to be looking for someone. Therefore, although the officers did not see the controlled substance, it was logical for the officers to believe that Mr. Cruz had the controlled substance on his person in anticipation of the drug deal. And it was reasonable for officers to believe that Mr. Cruz was going to destroy that evidence—a small quantity of drugs—when he fled into his home upon seeing the officers, where there was ample opportunity for the destruction. *See Aquino*, 836 F.2d at 1273 (holding that the destruction of evidence was likely even though the officers did not see or hear the destruction because there was "evidence that the source of the cocaine was growing suspicious [of police activity]"). As Detective Koppman explained at the suppression hearing, he believed that Mr. Cruz was going to destroy evidence when he fled because "[t]hat's what narcotics traffickers do." ROA, Vol. III at 26. Detective Koppman relied on his training and experience, testifying that "[i]f [narcotics traffickers are] running away from us, it's usually because they have evidence that they don't want to be found with, and they want to try to get rid of it. Usually flushing it. Flushing it or throwing it over a fence, throwing it on a roof. I've seen it all." *Id.* The foregoing reasonably created an exigency under the totality of circumstances, despite the fact that the officers did not hear or see the evidence being destroyed. *See Aquino*, 836 F.2d at 1273.

> iii. Officers' entry was limited in scope to the minimum intrusion necessary to prevent the destruction of evidence.

15

Mr. Cruz does not dispute that the officers' entry was limited in scope to the minimum intrusion necessary to prevent destruction of the evidence. He has therefore waived this argument. *See United States v. Beckstead*, 500 F.3d 1154, 1162–63 (10th Cir. 2007) (finding that defendant waived an argument by failing to include the argument in opening brief).

Regardless, the officers' entry here was limited in scope to the minimum intrusion necessary to prevent the destruction of evidence. Officers went into the bathroom of the residence—where Mr. Cruz was located—and they did not search anywhere else in the house until they obtained Mr. Cruz's consent to do so. *See* ROA, Vol. III at 32–36.

### iv. Officers' warrantless entry was supported by clearly defined indicators of exigency not subject to police manipulation or abuse.

As for the fourth prong, police manipulation is present only when officers "engag[e] or threaten[ ] to engage in conduct that violates the Fourth Amendment." *Hendrix*, 664 F.3d at 1339–40 (quoting *Kentucky v. King*, 563 U.S. 452, 462 (2011)) (alterations added).

Although acknowledging the Supreme Court's holding in *King*, Mr. Cruz relies on pre-*King* cases to argue that the police created the exigency here by setting up a controlled buy but failing to obtain a warrant. *See* Aplt. Br. at 22–23. *King* forecloses Mr. Cruz's argument. *King* answered the following question: "Under what circumstances do police impermissibly create an exigency?" 563 U.S. at 471. In doing so, it rejected the rule that police are prohibited from relying on an exigency

16

where "it was reasonably foreseeable that the investigative tactics employed by the police would create the exigent circumstances." *Id.* at 464–65 (internal quotation marks omitted) (reasoning that it would create difficulties for law enforcement officers who must make quick decisions in the field). Rather, *King* held that the police only impermissibly create an exigency when they engage or threaten to engage in conduct that violates the Fourth Amendment. *Id.* at 462.

Here, the officers did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment. As discussed above, the officers had probable cause for Mr. Cruz's arrest before he entered his home, and Mr. Cruz created the exigency of their having to enter his home when he fled from the officers. *See id.* at 470 (explaining that individuals who "elect to attempt to destroy evidence have only themselves to blame for the warrantless exigent circumstances search that may ensue"). Moreover, we have concluded that similar investigative tactics do not violate the Fourth Amendment. For instance, in *Hendrix*, we concluded that a warrantless entry into a defendant's motel room was justified where officers went "directly to the motel room at night without first seeking a warrant or further corroboration of the informant's tip, [gave] a false name, and continually demand[ed] entry after initially being refused." 664 F.3d at 1339. As in *Hendrix*, Mr. Cruz has not argued that the officers "threatened to enter the [residence] without permission unless admitted." *Id.* at 1340. For these reasons, the fourth prong is satisfied. The officers' warrantless entry was therefore justified under the destruction of evidence exception to the warrant requirement.

17

2. Hot Pursuit

The government argues—and the district court found—that the hot pursuit exception to the warrant requirement also justified the officers' entry into Mr. Cruz's home. Aple. Br. at 27; ROA, Vol. I at 140–42. On appeal, Mr. Cruz contends that this exception is inapplicable because the "police were not in the process of conducting a legitimate warrantless arrest [or] in the process of making an arrest at all." Aplt. Br. at 21.

One category of exigent circumstances is "an ongoing hot pursuit of a fleeing suspect." *United States v. Martin*, 613 F.3d 1295, 1299 (10th Cir. 2010). Under this doctrine, "police who attempt to arrest [a] felon outside [her] home may pursue her if she takes refuge inside." *Aquino*, 836 F.2d at 1271 (citing *United States v. Santana*, 427 U.S. 38, 42–43 (1976)). In other words, "a suspect may not defeat an arrest which has been set in motion in a public place." *Santana*, 427 U.S. at 43. "[H]ot pursuit means some sort of a chase, but it need not be an extended hue and cry in and about (the) public streets." *Id.* at 42–43 (internal quotation marks omitted). Hot pursuit occurs when an officer is in "immediate or continuous pursuit" of a suspect from the scene of a crime. *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).

As discussed above, Mr. Cruz's contention that there was no probable cause for his arrest is without merit. At issue, then, is Mr. Cruz's contention that the officers were not in the process of making an arrest. *See Manzanares v. Higdon*, 575 F.3d 1135, 1147 (10th Cir. 2009) (noting that both probable cause *and* either a warrant or exigent circumstances are required "to seize an individual in his home").

18

The record demonstrates that the officers were in "immediately or continuous pursuit" of Mr. Cruz from a public street into his home after he fled, in an effort to apprehend him. *Welsh*, 466 U.S. at 753. Detective Koppman testified that Mr. Cruz walked "out to the street," ROA, Vol. III at 24, then ran from the officers into his home, *id.* at 47. "When he ran," the officers tried to apprehend him, "[giving] him specific instructions to stop running, to get on the ground." *Id.*; *see United States v. Alarcon-Gonzalez*, 73 F.3d 289, 292 (10th Cir. 1996) ("An order to freeze communicates that suspects are not free to leave and is sufficient to effect a seizure."). Mr. Cruz did not stop, however. Instead, Detective Koppman testified that Mr. Cruz went "in the door [to his residence]," ROA, Vol. III at 32, and that the officers chased him immediately, *see id.* ("[W]e went in the door right after him."). *See also id.* at 36 (Detective Koppman stating that the chase occurred in a "matter of seconds"). Detective Koppman testified that as soon as the officers "[saw] him coming out of the bathroom . . . he was ordered to the ground and taken in custody." *Id.* at 32.

Mr. Cruz is correct that the officers *initially* did not want to arrest him, but the record demonstrates that their plans changed after he ran. At that point, officers attempted to seize him by asking him to stop and get on the ground, then arrested him immediately after chasing him into his home. Thus, Mr. Cruz's argument that "an arrest was not already in motion" when the officers went into the residence is not supported by the record. Aplt. Br. at 22. Accordingly, the hot pursuit exception, in addition to the destruction of evidence exception, justified the officers' warrantless

19

entry into Mr. Cruz's home.  There was thus no taint to Mr. Cruz's consent to officers' search of his home, and the evidence should not be suppressed.

## IV

For the foregoing reasons, we AFFIRM the district court's denial of Mr. Cruz's motion to suppress.