FILED
United States Court of Appeals
Tenth Circuit

May 21, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CORBAN JOSIAH ELMORE,

    Defendant - Appellant.

No. 22-1432

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:21-CR-00158-REB-JMC-1)**

_____

Amy W. Senia, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant-Appellant.

Marissa R. Miller, Assistant United States Attorney (Cole Finegan, United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.

_____

Before **BACHARACH**, **BRISCOE**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

After Corban Elmore's teenage son suffered a drug overdose at Elmore's home, law-enforcement officers secured the scene and prohibited anyone from entering the house. The officers then continued to investigate and allowed almost eight hours to elapse before applying for a search warrant. Once they had a warrant in

hand, the officers searched Elmore's home and discovered two firearms in his bedroom. Elmore entered a conditional guilty plea to being a felon in possession of a firearm and now appeals the denial of his motion to suppress. Because the eight-hour seizure of Elmore's home was unreasonable under the Fourth Amendment and because the exclusionary rule requires suppression of the firearms, we reverse and remand for further proceedings.

## Background

One Tuesday morning in Archuleta County—a rural area in southwestern Colorado—Elmore entered his teenage son's downstairs bedroom and found him unresponsive, unconscious, and not breathing. Suspecting a drug overdose, Elmore sought help from a friend who lived in a motorhome parked nearby on Elmore's property. After attempting CPR, the friend rushed back to his motorhome and called 911.

Responding to the dispatch report, a police officer drove to Elmore's home. By the time the officer arrived, Elmore had moved his son from the bedroom to a concrete sidewalk area outside the home. The officer administered Narcan (or naloxone), a medication that counters the effects of an opioid overdose. Elmore's son soon began breathing again, but he remained unresponsive.

At around 11:00 a.m., an emergency medical team arrived. When an emergency medical technician (EMT) asked if Elmore knew what drugs his son had taken, Elmore led the EMT inside the house, pointed the way to his son's bedroom, and gestured toward an open metal box lying on the bed. The box contained vials of

2

various drugs, including fentanyl and propofol, as well as an assortment of used drug paraphernalia. The EMT took the box with him, and the entire team then transported Elmore's son to the nearest hospital, which was about an hour away. Elmore also left the property, following the ambulance in a separate vehicle.

Shortly thereafter, at around 11:30 a.m., Detective Patrick Smith directed two officers to secure the Elmore home and prevent anyone from entering. Smith then drove to the hospital "to obtain additional information" about Elmore's son, who remained unconscious and had been intubated because he could not breathe on his own. R. vol. 1, 101. When Smith arrived, medical staff showed him the metal box, and he interviewed several staff members. Elmore was not at the hospital.[1] But Smith learned that Elmore had called the nurse's station to check on his son's status: Elmore gave the nurses two phone numbers to reach him and told them he was going to shower. Smith then called Elmore, who said he was on his way home and would meet Smith there.

About a half hour later, at around 2:00 p.m., Smith returned to Elmore's home. Elmore had yet to arrive, but his wife, Jessica Hayes, was there with their young child. Hayes had just been discharged from a three-day hospital stay for a foot injury

---

[1] The record is clear that Elmore "followed the ambulance in a separate vehicle." R. vol. 1, 107. But Smith's search-warrant affidavit states that "Elmore [did] not escort[] his son to the hospital." *Id.* at 74 (capitalization standardized). The district court did not resolve the tension between these two facts. And because this tension is not relevant to our analysis, we simply note that it's unclear whether Elmore ever arrived at or entered the hospital. What is clear is that he left his home at the same time as the EMTs and that he was not at the hospital when Smith arrived there.

and repeatedly asked to enter the house, but the officers on the scene denied her entry. The officers said that the house was a "crime scene" and that they were "conducting an investigation." R. vol. 4, 90. When Hayes asked Smith what evidence they were searching for, Smith said: "Well, I need to look for whatever else might be in there [that is] drug[-]related." Supp. R. vol. 2, Ex. J. at 2:57–2:59. Throughout the encounter, Hayes complained about her foot pain. Hayes also explained that there were several unsupervised pets inside the home in need of care and said that she would consent to a search of Elmore's son's bedroom. The officers did not take her up on this offer.

Elmore arrived home around 2:30 p.m. By then, Smith was on his way back to the sheriff's office, which was about a 40-minute drive. The officers still at the property informed Elmore that they were "holding the scene" because it was a "possible crime scene" and that he could not enter his home. *Id.* Ex. H at 23:20–23:27. The officers also said they were seeking a search warrant. Elmore suggested that the officers could search his son's bedroom if it meant his family could access the rest of the home, and he reiterated that several pets were stuck inside. As Elmore spoke with an officer, his young child sat on the ground and asked another officer standing nearby if he could get a toy inside. Despite their pleas, the officers refused to allow anyone to enter the house, and Elmore eventually left.

Meanwhile, at the sheriff's office, Smith conducted a series of phone interviews. One was with the EMT who recovered the metal box from Elmore's house. The EMT explained how he obtained the box and described its contents. Smith

4

also called a pharmacist to gather more information about the drugs found in the box, and the pharmacist noted that they were rarely seen outside a surgical hospital setting.

Back at Elmore's property, officers on the scene took photos of the home's exterior for the search-warrant application. In so doing, one officer saw what looked like a gun safe and a long, plastic gun carrier through the front windows. The officer relayed this information to Smith, which prompted him to run a criminal-history check on Elmore. The check revealed that Elmore had four felony convictions.

At around 7:30 p.m., about eight hours after securing Elmore's house, Smith applied for a warrant to search Elmore's house and truck for drugs and firearms. In support, Smith's search-warrant affidavit specified details he learned during the eight-hour seizure, including that an officer saw a gun safe inside the home; that Elmore's truck might contain a firearm (according to a statement Elmore purportedly made to the officers);[2] and that Elmore had prior felony convictions. A state-court magistrate judge issued the warrant about 20 minutes later. With the warrant in hand, Smith stopped for food at McDonald's and then drove to Elmore's property. The search uncovered, among other things, two firearms in Elmore's upstairs bedroom.

---

[2] The parties dispute whether Elmore made such a statement. The district court noted that there was conflicting evidence on this point and decided not to resolve the issue because it was "not material to [its] Fourth Amendment analysis." R. vol. 1, 206 n.3. The issue isn't material to our analysis either, so we do not address it further.

A month later, the government charged Elmore with being a felon in possession of a firearm.[3] *See* 18 U.S.C. § 922(g)(1). Elmore moved to suppress the evidence, arguing in part that the eight-hour seizure of his home violated the Fourth Amendment and tainted the evidence later discovered in it. The district court found no Fourth Amendment violation and denied the suppression motion.[4] It determined that the officers reasonably seized Elmore's home because they had probable cause to believe the home contained evidence of drug possession and had good reason to fear "an occupant of the . . . home would destroy [such] evidence before" they could secure a search warrant. R. vol. 1, 213. The district court also concluded that the officers acted reasonably throughout the seizure, finding it appropriate for them to prohibit anyone from entering the home and to delay obtaining a warrant so that Smith could focus on his investigation.

---

[3] The indictment did not charge Elmore's son or anyone else with a crime in connection with the overdose event.

[4] In so doing, the district court rejected a magistrate judge's recommendation to grant the motion based on Colorado's Good Samaritan statute, which establishes immunity from prosecution for drug-related offenses to those who report an overdose. *See* Colo. Rev. Stat. § 18-1-711. The district court acknowledged that "Elmore may fall within [that] immunity" for any state-law drug-related offenses. R. vol. 1, 211. But it concluded that the overdose event gave the officers "probable cause concerning possession of a controlled substance under *federal* law," and "[t]he Colorado immunity statute does not . . . grant immunity for a drug-related federal crime." *Id.* (emphasis added).

Elmore then entered a conditional guilty plea to the firearm charge, and the

district court sentenced him to 24 months in prison and three years of supervised

release.[5] Elmore now appeals.

**Analysis**

Elmore challenges the district court's order denying his motion to suppress.

When reviewing such a denial, we look at the evidence in the light most favorable to

the government and accept the district court's factual findings unless they are clearly

erroneous. *United States v. Cruz*, 977 F.3d 998, 1004 (10th Cir. 2020). But we review

de novo the ultimate question of reasonableness under the Fourth Amendment. *Id.*

## I.     Fourth Amendment Violation

The Fourth Amendment guarantees the "right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth

Amendment," as the text makes clear, "is 'reasonableness.'" *Riley v. California*, 573

U.S. 373, 381–82 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

And reasonableness "generally requires the obtaining of a judicial warrant" before

law-enforcement officers may search or seize a home. *Id.* at 382 (quoting *Vernonia*

*Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)). But not always—there are "a

---

[5] Elmore also pleaded guilty to possessing with intent to distribute heroin based on events that occurred months before the seizure. For this drug conviction, the district court imposed a concurrent 21-month prison sentence and three-year term of supervised release.

7

number of exceptions" to the warrant requirement. *Birchfield v. North Dakota*, 579 U.S. 438, 456 (2016).

One such exception is for "exigent circumstances." *Kentucky v. King*, 563 U.S. 452, 460 (2011). This exception applies "when an emergency leaves police insufficient time to seek a warrant." *Birchfield*, 579 U.S. at 456. For example, "a police officer armed with probable cause to believe a home contains evidence of a serious crime that might otherwise be destroyed may lawfully secure the home and restrict entry while waiting for an assisting officer to diligently procure a search warrant." *United States v. Shrum*, 908 F.3d 1219, 1231 (10th Cir. 2018). But even "a seizure reasonable at its inception" based on probable cause and exigency "may become unreasonable as a result of its duration or for other reasons." *Segura v. United States*, 468 U.S. 796, 812 (1984).

The Supreme Court applied these principles in *Illinois v. McArthur*, 531 U.S. 326 (2001). There, officers were on civil standby at a trailer home when they learned from the occupant's wife that the trailer contained drugs. *Id.* at 328–29. One officer left to obtain a search warrant, but the other officer stayed back to prevent the occupant from entering the trailer unaccompanied and destroying the evidence. *Id.* at 329. Two hours later, warrant in hand, the officers searched the trailer and discovered drugs inside. *Id.* Finding no Fourth Amendment violation, the Court pointed to four "circumstances" supporting reasonableness. *Id.* at 331–32. The initial seizure was reasonable because the officers (1) "had probable cause to believe that . . . [the] home contained evidence of a crime" and (2) "had good reason to fear" the destruction of

8

that evidence before the warrant's arrival. *Id.* And the seizure remained reasonable because (3) the officers "made reasonable efforts to reconcile" law-enforcement needs with personal-privacy demands and (4) the restraint lasted "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id.* at 332–33.

Relying on the four-pronged *McArthur* test here, Elmore argues that the warrantless seizure of his home violated the Fourth Amendment. He contends that the initial seizure was unreasonable because the officers lacked probable cause to believe the home contained his son's drugs or other evidence of drug possession and had no reason to fear anyone would destroy evidence. But even if the initial seizure was justified, Elmore maintains, the seizure became unreasonable because the officers made no effort to protect his interests and extended the seizure much longer than reasonably necessary to obtain the warrant.

We will assume, for argument's sake, that probable cause and exigency justified the initial seizure. So we limit our reasonableness analysis to whether the seizure, even if initially justified, later became unreasonable under the last two *McArthur* factors.

### A.    Law-Enforcement Needs and Personal-Privacy Demands

The third *McArthur* factor asks whether the officers "made reasonable efforts to reconcile their law[-]enforcement needs with the demands of personal privacy." *Id.* at 332. According to the district court, the officers did so here because they never placed Elmore or Hayes under arrest before obtaining a search warrant, leaving the

9

pair free "to come and go from the property" as they pleased. R. vol. 1, 214. And given the officers' stated fear of evidence destruction, the district court found it reasonable for the officers "to prohibit [the pair] from entering the home while the investigation and search[-]warrant process were ongoing." *Id.*

But the district court's analysis—echoed by the government on appeal—failed to assess the relevant considerations under both *McArthur* and our own precedent applying it. It is true that the officers neither arrested anyone nor searched the house before the warrant's arrival. But that does not necessarily render their conduct reasonable. As we explained in *Shrum*, the proper inquiry focuses on whether the officers made reasonable efforts "to reconcile their law[-]enforcement needs with [the d]efendant's Fourth Amendment interests in his home as a place of refuge, privacy, and comfort." 908 F.3d at 1232. The Supreme Court in *McArthur* concluded that the officers did so in part because they allowed the defendant to enter his home whenever he wished, so long as he was accompanied by an officer. 531 U.S. at 332. By contrast, we determined in *Shrum* that police made no effort to reconcile the competing interests at stake where the officer "would not even allow [the d]efendant supervised entry into his own home to urinate." 908 F.3d at 1232.

Here, like in *Shrum* and unlike in *McArthur*, the officers denied Elmore any entry into his home, even with police supervision.[6] And critically, the government

---

[6] Recall that Elmore sought to enter his home so that he could shower and care for his unsupervised pets. Moreover, his wife had just returned home from a hospital stay for a painful foot injury, and their young child wanted to retrieve a toy inside.

10

has not identified, nor can we discern, any law-enforcement interest that justified this encroachment on Elmore's Fourth Amendment interests in his home. On the contrary, the government concedes that the officers could have "gone further to accommodate . . . Elmore[]" and authorized "brief, supervised access to the home." Aplee. Br. 26. Indeed, allowing supervised entry would have achieved the only asserted law-enforcement need—preventing the destruction of evidence—while protecting Elmore's Fourth Amendment interests in his home. Because the officers made no effort, much less a reasonable effort, to strike a sound balance between those competing interests, this factor weighs heavily against the government.

### B.    Duration

The fourth and final *McArthur* factor asks whether the restraint lasted "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." 531 U.S. at 332–33. The seizure here lasted about eight hours, and the district court recognized that "[e]xcluding a person from their home for [that long] is a substantial deprivation." R. vol. 1, 215. But the district court found it "reasonable for . . . Smith to spend the time he did gathering information about the drugs involved, the circumstances of the overdose, and the related actions of . . . Elmore." *Id.* And it saw nothing in the record to suggest that Smith's investigative efforts "were delayed unreasonably." *Id.* at 216.

Here, too, the district court's analysis comes up short. *McArthur* authorizes warrantless seizures of a home to prevent destruction of evidence for "no longer than reasonably necessary for the police, acting with diligence, *to obtain the warrant*."

11

531 U.S. at 332–33 (emphasis added). It does not allow officers to seize a home *to investigate*, even if they conduct that investigation with diligence and ultimately secure a search warrant. After all, there is no "crime[-]scene exception" to the Fourth Amendment.[7] *Shrum*, 908 F.3d at 1231 (quoting *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999)).

The relevant question, then, is not whether Smith failed to perform his investigation with diligence; it is whether the seizure lasted longer than reasonably necessary to diligently obtain a search warrant. *See McArthur*, 531 U.S. at 332. The answer is yes. If the officers had probable cause to believe the home contained drugs or other evidence of drug possession when they first seized it—as we have assumed—then Smith necessarily had everything he needed to draft his search-warrant affidavit at that time. Yet before applying for a warrant, Smith spent hours digging into the details surrounding the overdose event and investigating Elmore for criminal conduct. By doing so, Smith extended the seizure much longer than reasonably necessary to obtain the warrant. *See, e.g.*, *Shrum*, 908 F.3d at 1231–32 (finding warrantless seizure unreasonable where police "had no knowledge of any facts suggesting [d]efendant . . . engaged in criminal wrongdoing inside [his] home" and exploited seizure to engage in "a fishing expedition to see what sort and how big of fish the police might catch"); *United States v. Cha*, 597 F.3d 995, 1001 (9th Cir.

---

[7] Yet recall that the officers told Elmore that they were "holding" the home and preventing anyone from entering because it was a "possible crime scene." Supp. R. vol. 2, Ex. H at 23:20–23:27.

2010) (finding warrantless seizure unreasonably long because "even if the police officers acted diligently during the seizure [by] interviewing witnesses multiple times and drafting a meticulous warrant application, they took a much longer time than was reasonably necessary to obtain the warrant").

Even so, relying on *Segura*, the government contends that the duration of the seizure presents no Fourth Amendment problem because it lasted "just eight hours." Aplee. Br. 28. To be sure, *Segura* upheld as reasonable a warrantless seizure that lasted 19 hours—over twice as long as the seizure here. *See* 468 U.S. at 801. But *Segura* did not establish a bright line before which any delay is reasonable. As the plurality explained, the reasonableness of the seizure in *Segura* turned on the "limited circumstances" of the case. *Id.* at 813. For one thing, much of the seizure in *Segura* occurred overnight, "when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests." *Id.* For another, the law-enforcement agents there did not "exploit[] their presence in the apartment"; they simply waited for the warrant's arrival. *Id.* at 812. And most importantly, the defendants "were under arrest and in the custody of the police throughout the entire period the agents occupied the apartment," meaning the "actual interference with their possessory interests in the apartment" was "virtually nonexistent." *Id.* at 813.

None of these circumstances are present here. The seizure of Elmore's home did not take place overnight; it began at around 11:30 a.m. on a Tuesday and spanned only hours in which judicial officers are "readily available." *Id.* Yet the officers exploited the seizure for hours to conduct additional investigation and then included

13

the results of that investigation in the search-warrant application eventually submitted in the evening. And Elmore—who was neither under arrest nor in police custody—sought to access his home during the seizure, so the interference with his Fourth Amendment interests in his house was far from "virtually nonexistent." *Id.*

In short, after seizing a home without a warrant, an officer must make it a priority to obtain a search warrant that complies with the Fourth Amendment. This obligation requires the officer to act with diligence to present a warrant application to a judicial officer at the earliest reasonable time based on the probable cause the officer possessed at the time of the seizure. Smith failed to act with such diligence here. Instead, he waited an unreasonably long time to obtain a search warrant so that he could investigate not only the overdose event, but also Elmore for unrelated criminal conduct. So this factor also weighs heavily against the government.

We conclude that the seizure in this case violated the Fourth Amendment. Even assuming probable cause and exigency supported the initial seizure of Elmore's home, that seizure became unreasonable when the officers made no effort to reconcile the competing interests at stake and extended the seizure longer than reasonably necessary to diligently obtain a search warrant.

## II.    Exclusionary Rule

Having concluded that the seizure violated the Fourth Amendment, we next consider whether to suppress the firearms discovered in Elmore's bedroom. *See Illinois v. Gates*, 462 U.S. 213, 223 (1983). The exclusionary rule is "the principal judicial remedy to deter Fourth Amendment violations." *Utah v. Strieff*, 579 U.S.

14

232, 237 (2016). It generally requires courts to exclude not only evidence "obtained as a direct result of an illegal search or seizure," but also so-called "'fruit[s] of the poisonous tree'"—that is, evidence discovered later but derived from the Fourth Amendment violation. *Segura*, 468 U.S. at 804 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

To suppress evidence under the "fruit of the poisonous tree" doctrine, the defendant must establish a "factual nexus between the illegality and the challenged evidence." *United States v. Neugin*, 958 F.3d 924, 931–32 (10th Cir. 2020) (quoting *United States v. Olivares-Rangel*, 485 F.3d 1104, 1108–09 (10th Cir. 2006)). This nexus need not be "particularly tight." *United States v. Suggs*, 998 F.3d 1125, 1142 (10th Cir. 2021). The "defendant need only show that 'the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'" *Id.* (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)). In other words, the evidence must be "in some sense the product of illegal governmental activity." *Segura*, 468 U.S. at 815 (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). Once the defendant satisfies this nexus requirement, the burden shifts to the government to show that the challenged evidence "is *not* 'fruit of the poisonous tree'" under an exception to the exclusionary rule. *Nava-Ramirez*, 210 F.3d at 1131 (emphasis added); *see also United States v. Ladeaux*, 454 F.3d 1107, 1110–11 (10th Cir. 2006) (describing this framework as a "burden-shifting scheme"). As relevant here, one such exception is the inevitable-discovery doctrine, which provides that the exclusionary rule does not apply if the

15

government proves by a preponderance that "the evidence inevitably would have been discovered by lawful means" even without the Fourth Amendment violation. *Neugin*, 958 F.3d at 932 (quoting *United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000)).

Elmore has satisfied the factual-nexus requirement here. Recall that before the unconstitutional seizure, the officers lacked any reason to believe that Elmore had firearms in his house, let alone that the firearms (even if they existed) were contraband or evidence of a crime. *See Gates*, 462 U.S. at 238 (explaining that probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place"). Yet the seizure allowed the officers to continue their investigation and acquire information establishing probable cause to believe the home contained illegal firearms.[8] And the officers then used this information to procure a warrant that authorized them to search for and seize firearms in Elmore's home, which led directly to the firearms in his upstairs bedroom. These circumstances establish the requisite nexus between the unconstitutional seizure and the firearms.

Nevertheless, the government asserts that Elmore cannot satisfy his initial burden because "the end result would have been exactly the same" even without the

---

[8] Indeed, but for that seizure, the officers would never have seen the gun safe through the windows or obtained any other information suggesting that there were firearms on Elmore's property. And since the gun-safe observation prompted Smith to run a criminal-history check on Elmore, the officers also would not have learned that Elmore had felony convictions, making it illegal for him to possess firearms. *See* 18 U.S.C. § 922(g)(1).

unconstitutional seizure. Aplee. Br. 30. According to the government, the officers would have applied for a search warrant; that warrant would have issued (because they had probable cause to search for evidence of drug possession); and they would have then discovered Elmore's firearms in his bedroom during the ensuing search.

But as Elmore points out, this argument is "doctrinally misplaced." Rep. Br. 21. Although framed as a factual-nexus challenge, it invokes the inevitable-discovery doctrine—a doctrine that places the burden of proof on the government, not the defendant. *See United States v. Christy*, 739 F.3d 534, 541 (10th Cir. 2014) (describing government's argument that "a warrant would have been obtained [and the evidence found] but for the illegal" conduct as a "theory of inevitable discovery"). Indeed, under the inevitable-discovery doctrine, "the exclusionary rule does not apply if the government can prove by a preponderance that 'the evidence inevitably would have been discovered by lawful means.'" *United States v. Braxton*, 61 F.4th 830, 833 (10th Cir. 2023) (quoting *Neugin*, 958 F.3d at 932). And that is the precise argument the government makes here: that in a counterfactual world without the unconstitutional seizure, the officers "would have . . . discovered [the firearms] by lawful means."[9] *Id.* (quoting *Neugin*, 958 F.3d at 932); *see also id.* (explaining

---

[9] When pressed on this point at oral argument, the government doubled down and insisted that its argument merely goes to Elmore's initial burden to show a but-for causal nexus. To be sure, we said in *Nava-Ramirez* that the defendant bears the burden of showing "[a]t a minimum, . . . [that] the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." 210 F.3d at 1131. And the inevitable-discovery doctrine does "bear upon 'but for' causation itself." *Shrum*, 908 F.3d at 1235. But as *Nava-Ramirez* also explained, the burden is on the government to prove—and not on the defendant to *disprove*—that

that inevitable-discovery doctrine involves "a counterfactual inquiry into what 'would have' happened under lawful circumstances" (quoting *Neugin*, 958 F.3d at 932)).

Yet despite bearing the burden of proof on inevitable discovery, the government devotes only a single, conclusory sentence to the issue. It merely asserts, without pointing to any supporting evidence or legal authority, that "[t]he officers would have applied for a warrant, it would have been granted (because they had probable cause), they would have executed the search, and they would have found the guns." Aplee. Br. 30. But when assessing "whether the government has met its [inevitable-discovery] burden of proof, we consider 'demonstrated historical facts,' not 'speculative elements.'" *United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003) (quoting *Nix*, 467 U.S. at 444 n.5). And when asked at oral argument to clarify its position, the government expressly disclaimed any reliance on the inevitable-discovery doctrine. The government has thus doubly waived any inevitable-discovery argument—first, by inadequately briefing it, and second, by intentionally abandoning it at oral

---

the challenged "evidence would have been inevitably [and lawfully] discovered," such that the result would have been the same even if the Fourth Amendment violation never occurred. 210 F.3d at 1131; *see also Nix v. Williams*, 467 U.S. 431, 444 (1984) (placing burden on prosecution to prove "by a preponderance of the evidence that the [challenged evidence] ultimately or inevitably would have been discovered by lawful means"). Requiring the defendant to disprove inevitable discovery, as the government would have us do here, would turn the doctrine on its head and improperly relieve the government of its well-established burden to prove inevitable discovery by a preponderance of the evidence. *See Nix*, 467 U.S. at 444.

18

argument.[10] *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004)

("This court will not consider . . . 'issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation.'" (quoting *Murrell*

*v. Shalala*, 43 F.3d 1388, 1390 n.2 (10th Cir. 1994))); *United States v.*

*Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007) ("[W]aiver is the

'intentional relinquishment or abandonment of a known right.'" (quoting

*United States v. Olano*, 507 U.S. 725, 733 (1993))).

In sum, Elmore has established the requisite factual nexus, and the

government fails to show that an exception to the exclusionary rule applies.

---

[10] Even if we were to reach the merits of the government's position, we would reject it. At oral argument, the government argued that the officers had probable cause to search for drugs in the entire house, including Elmore's bedroom, because his son had access to every room and thus could have hidden drugs anywhere. But "probable cause [for a search] on its own is not enough" to prove inevitable discovery; the doctrine requires "a 'high level of confidence' that the warrant would have—not could have—been issued" and that the evidence would have then been lawfully obtained. *Christy*, 739 F.3d at 543 n.5 (quoting *Souza*, 222 F.3d at 1205). Even if the government could prove that a warrant would have issued simply by showing probable cause, it defies common sense to believe that Elmore's teenage son might hide drugs in his father's upstairs bedroom. *See Gates*, 462 U.S. at 238 (explaining that issuing magistrate judge must "make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place"). And even if we go one step further and additionally assume that the officers had probable cause to search Elmore's bedroom for drugs belonging to his son, the government fails to show why the officers could, let alone would, have lawfully seized any firearms they saw there in plain view. To seize an object in plain view, "the incriminating character of the object" must be "'immediately apparent' to the officer." *United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014) (quoting *Horton v. California*, 496 U.S. 128, 136 (1990)). But the government does not argue on appeal that the incriminating character of Elmore's firearms would have been "immediately apparent" to the officers, who would have had no reason to believe that he could not legally possess them. *Id.* (quoting *Horton*, 496 U.S. at 136).

We therefore hold that the firearms discovered in Elmore's bedroom must be suppressed under the rule to deter officers from engaging in similarly unreasonable conduct.[11] *See Cha*, 597 F.3d at 1005 (noting that well-trained officer is presumed to know that warrantless seizure must last "no longer than reasonably necessary for the police, acting diligently, to obtain the warrant" (quoting *McArthur*, 531 U.S. at 332)).

## Conclusion

The seizure of Elmore's home was unreasonable under the Fourth Amendment. Even assuming probable cause and exigent circumstances justified the initial seizure, the officers made no effort, much less a reasonable effort, to reconcile their law-enforcement needs with Elmore's Fourth Amendment interests in his home. The officers also extended the seizure longer than reasonably necessary for them to diligently secure a warrant so that they could investigate not only his son's overdose, but also Elmore himself for unrelated criminal conduct. And because the exclusionary rule applies to this Fourth Amendment violation, the firearms discovered in Elmore's bedroom must be suppressed. We therefore reverse the district court's order denying suppression and remand for further proceedings.

---

[11] As a result, we need not address Elmore's alternative request that we remand for the district court to consider the two other Fourth Amendment issues he raised in his suppression motion.